BOATMEN'S BANK v. THOMAS E. GILLESPIE, JOHN F. GILLESPIE and F. L. DAYTON, Appellants.

Division Two, February 18, 1908.

1. **CORPORATION: Existence.** The certificate of incorporation issued by the Secretary of State to a corporation is a final determination of its right to do business, and thereafter no one except the State by a direct proceeding can question its corporate existence.

2. ————: ————: **Stock: Paid Through Fraud.** Where all the stock of a corporation was paid in money, it is not material, in a suit by a holder of one of the corporation's notes against its individual stockholders to recover from them on the theory that the company never became a corporation and was organized for the purpose of carrying on fraudulent transactions, whether the money so paid in was obtained by fair and honest means or otherwise.

3. ———: ———: **Inquiry by Secretary of State.** Under the law the Secretary of State is not required to make inquiry outside of the articles of association filed with him to determine whether the matters and things therein stated are in fact true, or that all conditions precedent have in fact been performed. If the papers, upon their face, conform to the requirements of the law, the Secretary of State is authorized, upon the payment of the necessary fees, to grant a certificate of incorporation to the company; and the statute provides that his "certificate, under the seal of the State, that said corporation has been duly organized, shall be taken by all courts of this State as evidence of the corporate existence of such corporation."

4. ———: ———: **Unauthorized Signing of Articles.** If the articles of agreement were regular on their face, it cannot be held that the corporation was not a corporation *de jure* or *de facto*, if certain of the named incorporators, whose names were signed to the articles by a trustee, did not in fact authorize him to sign their names thereto and did not in fact thereafter ratify his action.

5. ———: ———: **Non-Residents: To Avoid Liability.** Where the Secretary of State has granted to a corporation a certificate of incorporation, its corporate existence will not be declared to be void because the majority of the incorporators and active movers in its organization were residents of Kansas and their purpose in procuring a charter from Missouri was to evade the laws of Kansas governing the liability of stockholders in a corporation organized in that State.

6. ———: ———: ———: **Right to Charter.** Where citizens of another State desire to do business under a charter obtained in this State whose corporation laws seem to them more favorable than those of their own, they have a right to do so upon compliance with the laws of this State. That is a universal doctrine.

7. ———: ———: **Selling Stock.** Our laws do not forbid citizens of this State who have incorporated here to sell their stock to non-residents, even if they were at the time the company was incorporated the only three resident stockholders.

8. ———: ———: **Office in This State.** Although the company had no office in Missouri, and its business office was on the Kansas side of the building through which the State line ran, yet if all the meetings of the stockholders and directors were on the Missouri side of the building that was all that was necessary.

9. ———: ———: **Methods of Business.** In determining the validity of a corporation's existence, inquiry into its methods of business, the acts of its several stockholders, or any matter or

thing which occurred after the certificate of incorporation was granted, is not pertinent, in a suit by a bank against its incorporators to recover the amount of a note indorsed by the company.

10. ———: ———: **Election of Directors.** Where the record shows that there was a first board of directors, that they met and chose a president, vice-president, and secretary, that the vice-president lived in Missouri and the other officers left their homes in Kansas and moved to Missouri when the corporation began to do business, that the directors adopted a seal and that the company began to do business as a corporation, it cannot be held that the corporation never elected a board of directors.

11. ———: ———: **Acceptance of Charter: Inferred.** A corporation's charter is a contract between the State and the incorporators, and, like all contracts, to become an executed contract it is necessary that it should be accepted by the incorporators. But its acceptance may be inferred from the use of the franchise.

12. ———: ———: **Subscription by Trustee.** The act of an incorporator who subscribes for corporate stock as trustee for persons for whom he was not in fact authorized to subscribe, is not a nullity, and does not invalidate the legal corporate existence of the corporation. The legal title to the shares so subscribed by him became thereby vested in him, and he thereby binds himself personally for the stock thus subscribed for, whether he really believed he was trustee for the others or not, and he is liable to the company for calls made for the payment of the stock, just as is any other holder of the legal title of stock.

13. ———: ———: **Fraudulent Scheme.** In a suit by a bank against incorporators of a corporation, on a note made by the company, alleging that said company never became a corporation, inquiry cannot be made into the motives or intentions of the incorporators in obtaining a certificate of incorporation from the Secretary of State. So that evidence that the corporation was wrecked by the machinations and fraud of one Gillett, who, though the promoter of the organization, was not an incorporator, and had no control over nor interest in the corporation except to the extent of one-twentieth of its stock purchased by him after it had been issued, is not pertinent to show that the corporation did not in fact exist, nor that it was a fraudulent scheme entered into for the purpose of cheating and defrauding the public.

14. ———: ———: **Dummies.** Where there is a corporation completely organized with all its stock issued and paid for, having a board of directors, officers and an official seal, it is impossible, in a suit by a bank, against the incorporators, on a note endorsed

by the president of the corporation in his official capacity, to see the force or application of a contention that the charter "did not fit the parties to the articles," but that they were outside parties, unknown to the State at the time its certificate was issued, who wished to create a corporation in order to swindle the State and the public, the real incorporators being mere dummies.

15. ————: ————: **Finality of Certificate: Fraud.** A certificate of incorporation issued by the Secretary of State is a final determination of the corporation's right to do business as such, and thereafter the State only, by a direct proceeding, can challenge its corporate existence or its right to do business as such corporation, even though fraud were practiced upon the Secretary of State in obtaining the certificate.

16. ————: ————: **Incorporators: Liability as Partners and Individuals.** A failure of the corporation or its incorporators to comply with its duties or the conditions agreed upon in its articles, subsequently to the granting of its charter by the State, will not invalidate the incorporation, nor render the incorporators liable as partners or as individuals for the corporation's debts.

Appeal from Jackson Circuit Court.—*Hon. Shannon C. Douglass*, Judge.

REVERSED.

*C. O. Tichenor, Lathrop, Morrow, Fox & Moore, James P. Gilmore* and *George J. Mersereau* for appellants.

(1) Plaintiff's petition wholly fails to state a cause of action, and the issues of this appeal should, therefore, be determined in favor of appellants upon a consideration thereof alone, for the reasons: (a) The certificate of incorporation issued by the Secretary of State is a final determination of its right to be and do business as a corporation, and thereafter no one except the State, by a direct proceeding, can question its corporate existence. Secs. 955, 1312, 1313, R. S. 1899; Thompson on Corp., secs. 2991, 7709; Bank v. Rockefeller, 195 Mo. 15; Webb v. Rockefeller, 195 Mo. 57;

Kayser v. Bremen, 16 Mo. 88; Furniture & Carpet Co. v. Crawford, 127 Mo. 356; Ryland v. Hollinger, 117 Fed. 216; Wells Co. v. Gastonia Co., 198 U. S. 177; Rice v. Bank, 126 Mass. 300; Powder Co. v. Sinsheimer, 46 Md. 317; Palmer v. Lawrence, 3 Sandf. (N. Y.) 61; Cozzens v. Brick Co., 166 Ill. 213; Petty v. Hayden Bros., 115 Iowa 212; Casey v. Galli, 94 U. S. 673; Lattimer v. Baird, 76 Fed. 536; Moxie Nerve Food Co. v. Baumback, 32 Fed. 205; Demarest v. Flack, 128 N. Y. 201; Hastings v. Railroad, 9 Cush. 596; Gunderson v. Bank, 199 Ill. 420; Lancaster v. Imp. Co., 140 N. Y. 570; Manufacturing Co. v. Garst, 18 R. I. 484; Duggan v. Colorado M. & I. Co., 11 Col. 113; Swartqout v. Railroad, 24 Mich. 389; Church v. Froislie, 37 Minn. 447; Doty v. Patterson, 155 Ind. 60; Johnson v. Oerstrom, 70 Minn. 309; Stout v. Zylick, 48 N. J. L. 599. (b) Fraud practiced upon the Secretary of State (broadly expressed, the State) in procuring a certificate of incorporation, does not, in a collateral suit by private persons, nullify the certificate of the Secretary of State granting to the company the right or franchise to be a corporation, and does not, therefore, render the incorporation liable as partners or individuals. Thompson on Corporations, sec. 38; Morawetz on Corporations (2 Ed.), sec. 769; Bank v. Rockefeller, 195 Mo. 15; Venner v. Loan & Trust Co., 90 Fed. 348; Macon v. Shores, 97 U. S. 272; Vinegar Co. v. Foehrenbach. 148 N. Y. 63. (c) The failure of a corporation to comply with conditions or duties subsequent does not invalidate the corporation so as to render the incorporators liable as partners or as individuals to the creditors of the corporation. 10 Cyc. 227; Morawetz on Corp. (2 Ed.), secs. 29, 38; Thompson on Corporations, secs. 226, 6611; Granby Mining Co. v. Richards, 95 Mo. 106; Mining Co. v. Woodbury, 14 Cal. 424; Ryland v. Hollinger, 117 Fed. 216; Searcy v. Yarnell, 47 Ark. 269; Railroad v. Railroad, 110 Fed. 879. (2)

Where an agent undertakes to bind a principal when he has no authority to do so, he thereby makes himself personally liable, whether he acted in good or bad faith in so doing, and the allegations of the petition to the effect that Hollinger was not a trustee for Case and Stannard, and had no authority to sign their names, if true, in no way affect the validity of the corporation in question. 1 Cook on Corporations (4 Ed.), sec. 68; Ollesheimer v. Mfg. Co., 44 Mo. App. 172; Hotel Co. v. Wright, 73 Mo. App. 243; State ex rel. v. Smith, 48 Vt. 266; Lingenfelder v. Leschem, 134 Mo. 55; Durry v. Mallinkrody, 81 Mo. App. 449; Gestring v. Fisher, 46 Mo. App. 603; Wright v. Baldwin, 51 Mo. 269; Tailoring Co. v. Keeley, 59 Mo. 491; Blakeley v. Bennecke, 59 Mo. 193; Heath v. Goslin, 80 Mo. 310. (3) The alleged failure of defendants to pay anything for stock in the company, and the alleged understanding that they should not, and the allegation that the capital stock of the company was never paid as represented to the Secretary of State, do not avoid the incorporation, nor make the subscribers for the stock liable individually for the company's debts. Bank v. Rockefeller, supra; and authorities under point 1(b). (4) The allegations that the company had no office in the State of Missouri, and never transacted business in the State of Missouri, if true (which we deny), give the plaintiff no right to thus collaterally attack the existence of the corporation, and hold defendants liable as partners. Authorities under point 1 (c); Ryland v. Hollinger, 117 Fed. 216; Morawetz on Corporations (2 Ed.), sec. 965; Merrick v. Van Santvoord, 34 N. Y. 208; Moxie Nerve Food Co. v. Baumback, 32 Fed. 205; Hanna v. Petroleum Co., 23 Ohio St. 622; Land Co. v. Tilton, 19 Fed. 73. (5) The allegations that the company never elected a board of directors, as stated in the articles of association, if true (which we deny), neither state nor tend to state any cause of ac-

tion. Sec. 1312, R. S. 1899; Morawetz on Corporations
(2 Ed.), sec. 973; 21 Am. and Eng. Ency. Law, 845;
Hax v. Mill Co., 39 Mo. App. 453; In matter of Union
Ins. Co., 22 Wend. 591; In matter of Excelsior Ins. Co.,
38 Barb. 297; People v. Jones, 17 Wend. 181; Wright
v. Commonwealth, 190 Pa. St. 560; Schmidt v. Mitchell,
101 Ky. 570; Davidson v. Gaslight Co., 99 N. Y. 558;
Welch v. Bank, 122 N. Y. 177. (6) The allegations
that defendants were the only corporators residents
of Missouri, and the others were residents of Kan-
sas; that the defendants joined with the residents of
Kansas to form a Missouri corporation and then to do
and engage in business in Kansas, even though the
stockholders' liability under the Kansas laws was dif-
ferent from or any more onerous than that of Missouri,
if true, do not affect the validity of the corporation,
nor render defendants liable as partners or individuals
for the company's debts. Morawetz on Corporations
(2 Ed.), sec. 35; State ex rel. v. Cook, 181 Mo. 578; Roll-
ing Stock Co. v. People, 147 Ill. 234; Bank v. Hall, 35
Ohio St. 158; Petroleum Co. v. Weare, 27 Ohio St. 343;
Moxie Nerve Food Co. v. Baumback, 32 Fed. 205;
Merrick v. Van Santvoord, 34 N. Y. 208; Demarest v.
Flack, 128 N. Y. 205; Manufacturing Co. v. Garst, 18
R. I. 484; Vinegar Co. v. Foehrenbach, 148 N. Y. 63.
(7) Upon the entire record, the statutory require-
ments as to the payment of capital stock were fully
complied with, and no question can be made as to the
corporation being *de jure* on account thereof. State
ex rel. v. Wood, 13 Mo. App. 139; State ex rel. v. Wood,
84 Mo. 379. (8) Upon the entire record there was a
substantial compliance with the laws of the State of
Missouri requiring the company to keep an office in
Missouri, and all other requirements of law, and it
transacted its business almost entirely in this State,
and was, therefore, at all times a *de jure* corporation.
10 Cyc., 224, 1285; State ex rel. v. Wood, 13 Mo. App.

379; Rolling Stock Co. v. People, 147 Ill. 234; Thompson v. People, 23 Wend. 537; People v. Stockton, 45 Cal. 537. (9) Upon the entire record, the A. J. Gillespie Commission Company was, at least, a *de facto* corporation, and the incorporators or stockholders cannot be held liable individually or as partners for its corporate debts. Cook on Corporations (4 Ed.), sec. 234; Thompson on Corporations, sec. 38; Taylor on Corporations, sec. 45; Tulare Irr. Dist. v. Sheppard, 185 U. S. 1; Finnegan v. Building Ass'n, 52 Minn. 239; Johnson v. Schulin, 70 Minn. 147; Railroad v. Coal & Min. Co., 161 Mo. 288; Finch v. Ullman, 105 Mo. 255; Crenshaw v. Ullman, 113 Mo. 633; Granby Mining Co. v. Richards, 95 Mo. 106; Church v. Tobbein, 82 Mo. 413; St. Louis v. Shields, 62 Mo. 247; State v. Fuller, 96 Mo. 165; Fredericktown v. Fox, 84 Mo. 59; Smith v. Clark County, 54 Mo. 58; Macon v. Shores, 97 U. S. 272; Snider's Sons Co. v. Troy, 91 Fla. 224; Stout v. Zulick, 48 N. J. Law 559; Martin v. Fietz, 102 Cal. 55; Doty v. Patterson, 155 Ind. 65; Larned v. Beard, 65 N. H. 184; Bank v. Hall, 35 Ohio St. 158; Bank v. Padget, 69 Ga. 159; Bushnell v. Ice Co., 138 Ill. 67; Bank v. Stone, 38 Mich. 179; Owensboro Wagon Co. v. Mfg. Co. (Ala.), 31 So. 81; Clausen v. Head, 110 Wis. 403; Shoun v. Armstrong (Tenn.), 59 S. W. 790; Powder Co. v. Sinsheimer, 46 Md. 317; Gow v. Lumber Co., 109 Mich. 45; Ferguson v. Mercantile Co. (Miss.), 27 So. 877. (10) One who contracts with an organization as a corporation is estopped from denying the corporate existence thereof at the time of making the contract, or charging any defect in its organization affecting its capacity to contract as a corporation. West Missouri Land Co. v. Railroad, 161 Mo. 595; Bradley v. Reppell, 133 Mo. 545; Reinhard v. Mining Co., 107 Mo. 617; Broadwell v. Merritt, 87 Mo. 95; Ragan v. McElroy, 98 Mo. 349; Gas Light Co. v. St. Louis, 11 Mo. App. 555; Hasenritter v. Kirchhoffer, 79 Mo. 239;

Studebaker Bros. Mfg. Co. v. Montgomery, 74 Mo. 101; Ins. Co. v. Bowman, 60 Mo. 252; St. Louis v. Shields, 62 Mo. 247; Ins. Co. v. Needles, 52 Mo. 15; Stoutimore v. Clark, 70 Mo. 471; Railroad v. McPherson, 35 Mo. 13; Hotel Co. v. Hunt, 57 Mo. 126; Benevolent Society v. Murray, 145 Mo. 622. (11) Where the subscribers fail to pay for stock as recited in the articles of association, the statutes and equity afford a remedy whereby they may be compelled to pay for such stock, but the remedy afforded excludes the idea of partnership liability. Bank v. Rockefeller, 195 Mo. 15; Shields v. Watts, 94 Mo. 410; Van Cleve v. Berkey, 143 Mo. 109; Hequembourg v. Edwards, 155 Mo. 514; Berry v. Rood, 168 Mo. 316; Shields v. Hobart, 172 Mo. 491.

*I. N. Watson* for respondent.

(1) Defendants and their associates were neither a corporation *de jure* nor *de facto,* because they were not the same parties to whom the state issued the charter set up in defendants' answer. First. There was no agreement between the parties named in this paper to incorporate and this is the first requisite to a corporation either *de jure* or *de facto.* Second. It is clear from this evidence that the parties who were operating under this so-called charter were not the same body of men named in the paper. Third. The body of men named in this paper never accepted this charter and acted under it, but it was a different body entirely, who were conducting business as A. J. Gillespie Commission Co. (2) These parties were not a *de facto* corporation, because they were not the same body of individuals to whom the charter was granted, and this charter did not fit those attempting to operate under it. Bank v. Rockefeller, 195 Mo. 15; secs. 1312, 1313, 1314, 955, 2706, R. S. 1899; Ins. Co. v. Cerian, 43 N. H. 641; State ex rel. v. Critchett, 37 Minn.

209 Sup—15

13; 10 Cyc. Law, 229; Utley v. Co., 2 Gray 139; Ricker v. Larkin, 27 Ill. App. 625; Lyons v. Railroad, 32 Md. 18; Clark and Marshall on Corp. 44. (3) "Since a charter must be accepted according to its terms, a charter can be accepted by those persons only to whom it is granted. And when it is granted to a certain number of persons, it can not be accepted by a less number." Clark and Marshall, Private Corp., sec. 44 .(E), sec. 45; Morawetz on Private Corp., sec. 22; Montgomery v. Forbes, 148 Mass. 249; McGinty v. Athol Res. Co., 155 Mass. 183; Broderip v. Salomen, 2 Ch. Div. 323; Town of Seavey v. Yarnell, 47 Ark. 269; State v. Critchett, 37 Minn. 13; People v. Water Co., 97 Cal. 276; In re Germania Sangerbund, 12 Pa. Co. Ct. 89; People v. Golden Gate Lodge (Cal.), 60 Pac. 865. (4) There is no *de facto* corporation shown by this record for the reason the court found this was a fraudulent scheme of Grant G. Gillett and J. S. Hollinger to defraud the public and defendants were dummies aiding and abetting such scheme. Clark & Marshall, Corporations, secs. 61 and 82; Finnegan v. Norrenberg, 52 Minn. 239; Society, etc. v. Company, 42 Oh. St. 481; Jones v. Hardware Company, 29 L. R. A. 143; Pope v. Bank, 20 Kan. 440; Haas v. Bank, 41 Neb. 754; Duggan v. Investment Co., 11 Col. 113; Cook on Corporations, secs. 239 and 240; Evenson v. Ellington, 67 Wis. 634; Church v. Pickett, 19 N. Y. 482. (5) It is contended by the defendants herein that the plaintiff is estopped from denying the corporate existence of the A. J. Gillespie Commission Company because it dealt with the said company as a corporation. There are three answers to this position: First, plaintiff had no dealings with the defendants or the A. J. Gillespie Commission Company; second, estoppel cannot be pleaded as a defense where the defendants have been guilty of fraudulent conduct; third, no such issue was raised by the pleadings.

BURGESS, J.—This is an action on two promissory notes, each for $8,000, upon which plaintiff seeks to recover judgment against the defendants individually, as members of The A. J. Gillespie Commission Company, on the ground that said commission company, which indorsed and sold said notes, never became a corporation.

The petition is in two counts, the first count of which states: That on October 15, 1898, one G. G. Gillett and J. S. Hollinger, C. H. Pattison, E. C. Hollinger, Jos. Z. Reed, A. L. Hollinger and O. L. Thisler made, executed and delivered to the above-named defendants, under the name and style of The A. J. Gillespie Commission Company, their negotiable promissory note as follows:

"$8,000.00    Boatmen's Bank    October 15, 1898.

"One hundred and twenty days after date, without grace, for value received, we jointly and severally promise to pay to the order of The A. J. Gillespie Commission Co., eight thousand and no 100 ...... dollars, at the office of The A. J. Gillespie Commission Company, Live Stock Exchange, Kansas City, Kansas, with interest at the rate of eight per cent. per annum from maturity.

"We, the makers, endorsers, grantors, assignors, and sureties, severally waive the benefits of the exemption laws of the States and Territories of the United States, and also severally waive presentment for payment, demand, protest and notice of protest for non-payment of this note, and all defense on the ground of any extension of the time for its payment that may be given by its holders to the maker or makers thereof, or to any endorser or surety.

"G. G. GILLETT.

"P. O. Address, Woodbine, Kansas.

"Due Feb. 12, 1899."

Endorsed across the back as follows: "The A. J. Gillespie Com. Co. By J. S. Hollinger, Pt."

That prior to October 19, 1898, the said A. J. Gillespie Commission Company, for value received, endorsed across the back of said note the following: "The A. J. Gillespie Commission Co., by J. S. Hollinger, Pt.," and delivered said note to Hocker, Arnold & Woodson Brokerage Company, and that on October 19, 1898, said Hocker, Arnold & Woodson Brokerage Company, for value received, sold said note to plaintiff who ever since said date has been the owner and holder thereof. That notice of protest was expressly waived by said defendants.

That said note is now long past due, etc., wherefore plaintiff prays judgment for said eight thousand dollars and interest thereon at the rate of eight per cent per annum from maturity, and for costs.

The second count of the petition alleges in substance that on or about October 1, 1898, the defendants, together with J. S. Hollinger, C. H. Pattison, E. C. Hollinger, and J. S. Hollinger, as trustee for J. B. Case, Jos. Z. Reed, Otis L. Thisler, C. A. Stannard and A. L. Hollinger, formed themselves into a voluntary association, and filed with the Secretary of State a paper purporting to be articles of incorporation, signed and acknowledged by said parties. The said articles, which are fully set out in the petition, show the location of the company as Kansas City, Missouri, and its capital stock as one hundred thousand dollars, divided into one thousand shares of the par value of one hundred dollars each, of which the defendants each subscribed for one hundred shares. J. S. Hollinger signs as trustee for J. B. Case, Jos. Z. Reed, Otis L. Thisler, C. A. Stannard and A. L. Hollinger. The place of the residence of the defendants, as shareholders, is given in the articles as Kansas City, Missouri, and that of the others as the State of Kansas. Defend-

ants are also named among the eleven directors of the company, the other directors being J. S. Hollinger, C. H. Patterson, E. C. Hollinger, A. L. Hollinger, J. B. Case, Jos. Z. Reed, Otis L. Thisler and C. A. Stannard.

The petition then avers that said Case and Stannard never authorized said J. S. Hollinger to sign their names to such agreement and never ratified said signing; that the defendants were not *bona fide* subscribers to said paper, and were only nominal parties to said arrangement; that said association never had or maintained an office in or transacted business in this State, and never elected a board of directors as stated in said paper, and that said attempt to incorporate was for the fraudulent purpose to obtain a charter under the laws of Missouri, and evade the laws of Kansas governing stockholders' liability in said State; that the defendants paid nothing for any stock in said company, and that the capital stock of said company never was paid as represented to the Secretary of State. That "the Secretary of State of Missouri, relying upon the written statements contained in said written agreement, aforesaid, and believing that all the persons whose names were appended to said paper, had actually entered into said agreement and signed the same, and believing that said parties were all *bona fide* subscribers to said articles of agreement, and had *bona fide* subscribed for the shares of stock set opposite their names, and had met and elected the board of directors named therein, and that the capital stock had been fully paid up as therein stated, and believing that said alleged corporation intended *bona fide* to engage in business in the State of Missouri, and maintain its general office in Kansas City, Jackson county, Missouri, and believing all said statements to be *bona fide* and true, issued a certificate of incorporation, in the name of The A. J. Gillespie Commission Company, under the laws of the State of Missouri, when in truth and in fact

said statement that said parties had associated themselves together and entered into the said agreement, was false and fraudulent, and said statement that said capital stock should be one hundred thousand dollars, and that the same had been *bona fide* subscribed and actually paid in, and in the custody of the board of directors, was false and fraudulent, and the statement that said alleged incorporators had met and selected the board of directors named in said paper, was false and fraudulent, and the statement that said parties had *bona fide* subscribed the number of shares set opposite their names was false and fraudulent, and the statement that said company should be located in Kansas City, Jackson county, Missouri, was false and fraudulent, and the said attempt to procure said articles of incorporation by the parties who actually signed said paper was for the purpose of enabling said non-residents, parties above named, to come into the State of Missouri, and by the above-named false and fraudulent statements procure articles of incorporation from the Secretary of State of Missouri and then engage in business in the State of Kansas, and evade the corporation laws of Kansas.''

The petition further alleges that said parties knew that said Case and Stannard had not signed said articles of agreement and had not authorized any one to do so, and knew that the alleged board of directors named in said paper had not been selected as set forth in said paper, and that they were not attempting to incorporate in Missouri for the *bona fide* purpose of carrying on business under the laws of Missouri, but of the State of Kansas, and did actually transact all the business of the alleged corporation in the State of Kansas; that on or about the — day of October, 1898, the defendants and J. S. Hollinger, C. H. Pattison, E. C. Hollinger, Jos. Z. Reed, A. L. Hollinger, and O. L. Thisler, doing

business under the name of The A. J. Gillespie Commission Company, obtained from one G. G. Gillett a certain promissory note, etc.   The note is set out in full, and is in all respects, including the endorsement, similar to the note described in the first count except that it is dated October 12, 1898, the date of the note set out in the first count being October 15, 1898.   The same allegations are also made as to the sale and delivery of the note to the Hocker, Arnold & Woodson Brokerage Company, and purchase of said note from said company by plaintiff on October 19, 1898.

The petition then states: "that on or about said 1st day of December, 1898, said above-named parties closed their said office in the State of Kansas, went out of business, leaving a large amount of indebtedness and liabilities to this plaintiff and other persons, and this plaintiff has never been able to find any books, papers or assets of said alleged corporation, and has never been able to realize anything whatever on its notes aforesaid, and never has been able to discover any property, money or effects belonging to said alleged company."

The defendants' answer to the first count of plaintiff's petition was (1) a general denial; (2) a specific denial, under oath, of the execution and delivery by Gillett, on October 15, 1898, of said note to the defendants and others, under the name and style of The A. J. Gillespie Commission Company; (3) a specific denial, under oath, "that prior to October 19, 1898, said The A. J. Gillespie Commission Company, for value received, endorsed across the back of said note the following, 'The A. J. Gillespie Commission Company, By J. S. Hollinger, Pt.,' and delivered said note to Hocker, Arnold & Woodson Brokerage Company; (4) an affirmative defense, that said G. G. Gillett executed and delivered the note in said first count of said amended petition set out to the A. J. Gillespie Commission Com-

pany, a corporation duly created and existing according to law, and that said The A. J. Gillespie Commission Company placed upon said note the endorsement in said first count set out.

The answer to the second count was (1) a general denial; (2) a specific denial, under oath, that the defendants and others named formed themselves into a voluntary association by the agreement set out in said second count, but that said individuals associated themselves together for the purpose of forming a corporation, "and that, by means of said agreement and the proceedings and steps in connection therewith, and based thereon, there was duly created, according to law, the corporation The A. J. Gillespie Commission Company contemplated and mentioned in said agreement;" (3) a specific denial, under oath, that the defendants and others named, doing business under the name of The A. J. Gillespie Commission Company, obtained from one G. G. Gillett the note set out in said second count; (4) a specific denial, under oath, that defendants and others, doing business under the name of The A. J. Gillespie Commission Company, endorsed across the back of the note set out in the second count "The A. J. Gillespie Commission Company, By J. S. Hollinger, Pt.," and sold and delivered same to Hocker, Arnold & Woodson Brokerage Company; (5) an affirmative defense that said note "was obtained from one G. G. Gillett, not by defendants and the other individuals, named in said second count, but by The A. J. Gillespie Commission Company, a corporation duly created and existing according to law," and that the endorsement on said note was not by the defendants and other individuals, but by The A. J. Gillespie Commission Company.

Plaintiff's reply to said answer was a general denial.

Before the introduction of evidence, the defend-

ants objected to the introduction of any evidence under either the first or second count of the petition, on the ground that neither of said counts stated facts sufficient to constitute a cause of action, which objections were overruled, the defendants excepting to the court's ruling.

The cause was tried by the court, without aid of a jury. At the close of all the evidence, the defendants asked, and the court refused, the following declarations of law:

"1. The court declares the law to be that upon the pleadings and the evidence plaintiff cannot recover upon the first count of the petition.

"2. The court declares the law to be that upon the pleadings and the evidence plaintiff cannot recover upon the second count of the petition.

"3. The court declares the law to be that if, for the purpose of forming a corporation under the name of The A. J. Gillispie Commission Company, defendants, with others, signed and acknowledged the articles of association read in evidence, recorded in the office of the recorder of deeds of Jackson county, Missouri, at Kansas City, and filed in the office of the Secretary of State of the State of Missouri, a certified copy of the articles so recorded, and if the said Secretary of State issued the certificate of incorporation read in evidence, such certificate must be taken as evidence of the corporate existence of said company, and in this case no question can be tried as to whether the company was properly organized or not, and no collateral attack can be made upon the corporate existence of said company.

"4. The court declares the law to be that if, prior to or at the time plaintiff acquired the notes in controversy, it knew that The A. J. Gillespie Commission Company was doing business as a corporation, and in the conduct of its business was acting as a corporation,

and if plaintiff's dealings with it or in regard to the acquisition of the notes in controversy were upon the basis that it was a corporation, and if, in acquiring said notes;. plaintiff recognized said A. J. Gillespie Commission Company as a corporation and took said notes, relying upon the endorsement of its name thereon as its endorsement as a corporation and as creating an endorsed corporate obligation of said company and not as partnership obligations, and with no intention at the time of binding defendants or any other person interested in said company individually or as partners, and knowing that such endorsement was intended to bind said company in its corporate capacity only, then plaintiff is estopped to deny the corporate capacity of said company and cannot now be heard to complain that the corporation was not properly formed or created.

"5. The court declares the law to be that the certificate of incorporation read in evidence must be accepted as evidence of the corporate existence of the A. J. Gillespie Commission Company, and in the absence of any attack upon the corporate existence of said company by the State of Missouri, no attack can be made thereon in this suit."

"7. The court declares the law to be that if Hollinger did not have authority to sign the articles of association read in evidence for Case and Stannard, then by so doing he bound himself, and the subscriptions purporting by said articles to be for Case and Stannard stand as subscriptions made by Hollinger for himself."

To the action of the court in refusing to declare the law as above the defendants duly excepted.

Plaintiff's counsel, at the close of the evidence, submitted to the court certain findings of fact deduced from the evidence, which findings were approved and given by the court, as its findings, and judgment was

rendered in favor of plaintiff and against defendants on both counts of the petition.

Defendants duly filed motions for new trial and in arrest of judgment, which were overruled, whereupon an appeal was taken to this court.

The findings of fact by the court were as follows:

"That prior to September 29, 1898, Grant G. Gillett; J. S. Hollinger, C. H. Patterson, E. C. Hollinger, J. B. Case, James Z. Reed, C. A. Stannard, A. L. Hollinger and O. L. Thisler were residents of Dickinson county, Kansas. That said parties attempted to organize a corporation under the laws of Missouri, known as the Central Live Stock Commission Company, but owing to the fact that a similar corporation existed at that time in the State of Missouri, their application was refused by the Secretary of State. The evidence shows that J. S. Hollinger, Grant G. Gillett and David Naill were the moving spirits in attempting to organize this corporation under the laws of the State of Missouri.

"I find from the evidence that on or about September 29, 1898, Grant G. Gillett was indebted in a large sum of money to various persons and banks throughout the country and was in an insolvent condition.

"I find from the evidence that on or about September 29, 1898, J. S. Hollinger, and his sons, A. L. Hollinger, W. H. Hollinger, Jos. and W. Hollinger, and C. H. Hollinger were heavily indebted to various parties and banks throughout the country and that they were in an insolvent condition.

"I find from the evidence that in September, 1898, Grant G. Gillett and J. S. Hollinger entered into a fraudulent scheme for the purpose of cheating and defrauding the public by the following means: Said Gillett and J. S. Hollinger conceived the idea of forming a corporation under the laws of the State of Missouri for the purpose of floating a large amount of worthless paper, and that in order to accomplish this

purpose they approached C. H. Patterson of Abilene, Kansas, and requested him to be a stockholder in this corporation to be organized under the laws of the State of Missouri, agreeing to give him fifty shares of stock of the par value of $100 per share if he would permit his name to be used as one of the incorporators. Patterson at that time was county treasurer of Dickinson county, Kansas. I further find from the evidence that Patterson signed said articles of incorporation for $5,000 of stock, but was not to pay for same and did not pay anything therefor. C. A. Stannard at that time resided in Hope, Dickinson county, Kansas, and was an extensive dealer in fancy breeds of cattle. He was approached by the Hollingers and requested to go into this proposed corporation to be organized under the laws of the State of Missouri, but he declined to do so. J. B. Case resided at Abilene, Kansas, and was a man of large wealth and excellent standing, and he was also approached and requested to become a stockholder in this proposed Missouri corporation, and he likewise refused to become a stockholder in the proposed corporation.

"The evidence shows that in August, 1898, Grant G. Gillett attempted to negotiate a large loan in St. Joseph, Missouri, but his paper had been refused. Along in August, 1898, Gillett had attempted to sell several hundred head of cattle which he claimed to own to one E. R. Clark of Marion, Kansas. At that time the cattle proposed to be sold were heavily mortgaged to other parties. On September 26, 1898, Clark gave notes secured by mortgages upon those Gillett cattle, aggregating $39,200, to J. S. Hollinger, these notes purporting to be secured by chattel mortgage on the above cattle which Grant G. Gillett claimed to own, and which were stated to be in the possession of a man by the name of Dunlap in Chase county, Kansas. The evidence shows that this man Dunlap was a 'straw' man

for Grant G. Gillett. The evidence also shows that E. R. Clark received no money from J. S. Hollinger for these notes aggregating $39,200 and the mortgage securing the same. The evidence of Clark shows that Hollinger paid nothing whatever for these notes and the mortgage securing the same.

"I further find from the evidence that on October 17, 1898, E. R. Clark, at the request of J. S. Hollinger, made new notes to The A. J. Gillespie Commission Company for the same amount, to-wit, $39,200, and gave same to Hollinger to take up the other notes given to Hollinger on September 26, 1898, and they were dated back to September 26, 1898, and a mortgage was given to secure the same, and described the cattle identically the same as in the mortgage given to J. S. Hollinger dated September 26, 1898. When Clark went to get said cattle he found the same in the possession of other parties and Clark never had possession of the said cattle supposed to belong to Gillett.

"I further find from the evidence that E. R. Clark received no money whatever for this second set of notes dated back to September 26, 1898, and which were given to The A. J. Gillespie Commission Company, October 17, 1898. I find from the evidence that on October 17, 1898, these notes were discounted by the A. J. Gillespie Commission Company through Hocker-Arnold-Woodson Brokerage Company and $35,000 was drawn out of the company by J. S. Hollinger, and the books of the A. J. Gillespie Commission Company introduced in evidence shows that on October 17th E. R. Clark is charged with $35,000, and the same date is credited with $35,000, and the cash book shows check made payable to J. S. Hollinger for $35,000 and marked account of E. R. Clark loan. This check was cashed by J. S. Hollinger. No part of this money was received by E. R. Clark, and the evidence shows that this was part of the scheme adopted by J. S. Hollinger and Grant

G. Gillett in raising the amount of money used as capital stock of the A. J. Gillespie Commission Company. I further find that said The A. J. Gillespie Commission Company sold and endorsed said notes and delivered same to Hocker-Arnold-Woodson Commission Company and received proceeds of same.

"I further find from the evidence that on September 29, 1898, Grant G. Gillett procured one T. Kinehan to execute his promissory notes to the A. J. Gillespie Commission Company, aggregating in round numbers $39,000; that those notes purported to be secured upon cattle which Grant G. Gillett claimed to own; and the evidence shows that Kinehan was a 'straw' man executing notes at the solicitation of Grant G. Gillett, and gave chattel mortgages upon cattle then claimed to be owned by Grant G. Gillett, but which, in fact, never belonged to Gillett.

"I find from the evidence that these T. Kinehan notes, endorsed by said company, were delivered to Hocker-Arnold-Woodson Brokerage Company, to be negotiated by that company, and the same were negotiated by that company, and a check was given by Hocker-Arnold-Woodson Brokerage Company to A. J. Gillespie Commission Company, dated September 29, 1898, for the sum of $36,743, and across the face of said check was written not to be used until certificate of incorporation was issued by the Secretary of State to A. J. Gillespie Commission Company. I further find from the evidence that on September 30, 1898, Thomas E. Gillespie, John T. Gillespie of Kansas City, Missouri, J. S. Hollinger, C. H. Patterson of Abilene, Kansas, and F. L. Dayton of Kansas City, Missouri, and E. C. Hollinger of Dickinson county, Kansas, signed articles of agreement for incorporation under the laws of the State of Missouri. I further find from the evidence that J. S. Hollinger signed the name of J. B. Case, Jos. Z. Reed, C. A. Stannard, O. L. Thisler and A. L. Hol-

linger to said paper. That said Hollinger purported to act as trustee for said parties, but the evidence shows that he had no authority to sign the name of. C. A. Stannard and J. B. Case, Jos. Z. Reed and O. L. Thisler, but the evidence shows that Jos. Z. Reed and O. L. Thisler by their acts thereafter ratified the signing of their names to said article. I further find from the evidence that by said article J. S. Hollinger subscribed for three hundred and fifty shares of stock; J. T. Gillespie of Kansas City, Missouri, one hundred shares; Thomas E. Gillespie of Kansas City, Missouri, one hundred shares; C. H. Patterson of Abilene, Kansas, fifty shares; F. L. Dayton of Kansas City, Missouri, one hundred shares; E. E. Hollinger of Kansas City, Missouri, fifty shares; J. S. Hollinger of Abilene, Kansas, trustee for J. B. Case of Abilene, Kansas, fifty shares; Jos. Z. Reed of Herrington, Kansas, fifty shares; O. L. Thisler of Chapman, Kansas, fifty shares; C. A. Stannard of Hope, Kansas, 50 shares; A. L. Hollinger of Pearl, Kansas, fifty shares. I further find from the evidence that Thomas E. Gillespie, John T. Gillespie, C. H. Patterson, F. L. Dayton, J. B. Case and C. A. Stannard paid nothing whatever to this company on account of any stock subscription. I further find that A. L. Hollinger paid the sum of $3,000, but just at what period of time is not shown by the evidence. The evidence shows that at the time this paper was signed J. S. Hollinger owed his son, A. L. Hollinger, $1,500 to $2,000; the evidence of A. L. Hollinger does not show the exact amount, but he states it to be from $1,500 to $2,000; that J. S. Hollinger had owed him that amount for some time and that J. S. Hollinger was to pay that indebtedness to this proposed corporation on behalf of A. L. Hollinger.

"I further find from the evidence that the defendants, Thomas E. Gillespie, John T. Gillespie and F. L. Dayton, had an agreement with J. S. Hollinger that

they were not to pay anything for the stock subscribed
by them, and that they were understood to be and were
at that time mere nominal stockholders, and to have no
interest whatever in the corporation; that they signed
the articles of incorporation for accommodation only,
to enable these parties from Kansas to procure arti-
cles of incorporation in the State of Missouri; that it
was the understanding at the time they signed said
articles that they were to pay nothing for any stock,
and were not to be *bona fide* stockholders, and were to
have no interest whatever in the corporation, but were
to hold the stock for such time as J. S. Hollinger de-
sired, and should also assign said stock over to whom-
soever J. S. Hollinger designated. The evidence does
not show how much J. S. Hollinger paid September
30th for the stock subscribed by him, but the evidence
tends to show that J. S. Hollinger negotiated the Clark
notes given to him on September 26, 1898, in the
manner above stated, aggregating $39,200, and the pro-
ceeds of said notes deposited in bank as the capital
stock of this proposed company; and that on October
17th he procured Clark to issue a new set of notes se-
cured by a mortgage for the same amount, and they
were negotiated by the company, and the proceeds
thereof were paid to J. S. Hollinger. The evidence
shows that the amount of the proceeds obtained from
this Clark loan was just the amount of capital stock
subscribed by J. S. Hollinger. The evidence shows that
on October 3rd the A. J. Gillespie Commission Com-
pany had to its credit in the National Bank of Com-
merce the sum of $28,500 and in the Stock Yards Bank
of Commerce the sum of $50,000, making the sum of
$78,500. The evidence shows that said $78,500 was made
up of the said $36,743 obtained by the A. J. Gillespie
Commission Company from the negotiation and sale
by the Hocker-Arnold-Woodson Brokerage Company
of the Kinehan notes, and also including the discount

from the Clark notes, and $5,000 of money of O. L. Thisler in the hands of J. S. Hollinger, making from the three sources the amount of money shown to be in the banks at that time.

"I also find that the certificate of incorporation issued by the Secretary of State is as follows:

" 'ARTICLES OF INCORPORATION.

" 'Be it known that the undersigned, in order to incorporate under the laws of Missouri, governing the formation of manufacturing and business companies, do hereby enter into the following agreement:

" '1. The name of the company shall be The A. J. Gillespie Commission Company.

" '2. The company shall be located at the city of Kansas City, Jackson county, Missouri.

" '3. The amount of the capital stock of the company shall be one hundred thousand dollars, divided into one thousand shares, of the par value of one hundred dollars each; that the same has been *bona fide* subscribed and actually paid up in lawful money of the United States and is in the custody of the persons hereinafter named, as the first board of directors.

" '4. The names, places of residence of the several shareholders, and the number of shares of stock subscribed by each are as follows:

|                                                              | NO. OF SHARES. |
| ------------------------------------------------------------ | -------------- |
| J. J. Hollinger of Abilene, Kansas                           | 350            |
| J. T. Gillespie of Kansas City, Missouri                     | 100            |
| Thomas E. Gillespie of Kansas City, Missouri                 | 100            |
| C. H. Patterson of Abilene, Kansas                           | 50             |
| F. L. Dayton of Kansas City, Missouri                        | 100            |
| E. C. Hollinger of Kansas City, Missouri                     | 50             |
| J. S. Hollinger of Abilene, Kansas, Trustee for J. B. Case of Abilene | 50    |

209 Sup—16

For Jos. Z. V. Reed of Herrington, Kansas...... 50
For Otis L. Thisler of Chapman, Kansas....... 50
For C. A. Stannard of Hope, Kansas........... 50
For A. L. Hollinger of Pearl, Kansas........... 50

" '5. The directory of the company shall be composed of 11 shareholders, and the names of those agreed upon, for the first year, are: J. S. Hollinger, Thomas E. Gillespie, J. S. Gillespie, C. H. Patterson, F. L. Dayton, E. C. Hollinger, A. L. Hollinger, J. B. Case, Joseph Z. Reed, Otis L. Thisler and C. A. Stannard.

" '6. The company shall continue for a term of twenty years.

" '7. This company is formed for the following purposes, to-wit: Owning, buying and selling live stock of all kinds, feeding the same and dealing in such both as principal and on commission; owning such real estate as may be necessary for the proper conducting of such business; making and negotiating loans, mortgages, notes, etc., of its own and others, for itself and its customers, and generally the doing of all things necessary for carrying on the live stock business both as principal and as commission dealers.

" 'In testimony whereof, we have hereunto set our hands and seals this 30th day of September, A. D. 1898.

<div style="margin-left:2em;">

J. S. HOLLINGER,   (Seal)
THOMAS E. GILLESPIE,   (Seal)
J. T. GILLESPIE,   (Seal)
C. H. PATTERSON,   (Seal)
F. L. DAYTON,   (Seal)
E. C. HOLLINGER,   (Seal)
J. S. HOLLINGER,   Trustee.
for J. B. CASE,   (Seal)
JOSEPH Z. REED,   (Seal)
C. A. STANNARD,   (Seal)
A. L. HOLLINGER, and   (Seal)
O. L. THISLER,   (Seal)

</div>

" 'State of Kansas, Dickinson County, ss.

" 'On this 30th day of September, 1898, before me personally appeared J. S. Hollinger and C. H. Patterson, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

" 'In testimony whereof, I have hereunto set my hand and affixed my official seal at my office in Abilene, Kansas, the day and the year first above written.

" 'My commission expires January 24, 1899.

(Seal)                    E. C. HOLLINGER,
                              Notary Public.

" 'State of Kansas, Wyandotte County, ss.

" 'On this 30th day of September, 1898, before me personally appeared J. T. Gillespie and F. L. Dayton and E. C. Hollinger, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

" 'In testimony whereof, I have hereunto set my hand and affixed my official seal at my office in......
...... the day and year first above written.

" 'My commission expires March 28th, 1902.

(Seal)                    JAMES RATCLIFFE,
                              Notary Public.

" 'State of Kansas, County of Dickinson, ss.

" 'On this 30th day of September, 1898, before me personally appeared J. S. Hollinger, as trustee for A. L. Hollinger, J. B. Case, Joseph Z. Reed, Otis L. Thisler and C. A. Stannard, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

" 'In testimony whereof I have hereunto set my hand and affixed my official seal at my office in the day and the year first above written.

" 'My commission expires January 24, 1899.

(Seal)                              E. C. HOLLINGER,

Notary Public.

" 'Filed for record and duly recorded in my office this 1st day of October, A. D. 1898, at 9 o'clock fifty-three minutes, a. m.

" 'O. H. QUEAL, Recorder.

" 'By S. A. GILLESPIE, Deputy.'

"That said certificate was issued on the 3rd day of October, 1898. I further find from the evidence that at the time said written articles were filed with the Secretary of State, it was false in the following particulars, to-wit: That J. B. Case and C. A. Stannard never signed said articles of incorporation, nor authorized any one to sign their names to said paper, and did not know that their names were signed to said paper, until after the A. J. Gillespie Commission Company had failed in business, which was in the latter part of November, 1898; that said parties never participated in any meetings leading up to the organization of said A. J. Gillespie Commission Company and never consented to act as directors, and never did act as directors.

"The evidence shows that prior to the signing of these articles of incorporation, A. J. Gillespie and Sons, including the two defendants, Thomas Gillespie and John Gillespie, were engaged in business at the Live Stock Exchange in Kansas City, Kansas. That J. S. Hollinger and Grant G. Gillett purchased from A. J. Gillespie and Company their business at the Kansas City Stock Yards, for which they agreed to and did pay the sum of $15,000. This purchase was made about a week prior to the time the articles of incorporation were issued. The evidence shows that at the time the proposed articles of agreement were signed, it was understood and agreed by the sign-

ers that this new company should occupy the offices in Kansas City, Kansas, which had been occupied by A. J. Gillespie and Company.

"I further find from the evidence that the A. J. Gillespie Commission Company at no time maintained an office in the State of Missouri, as required by the statute in such case made and provided.

"I further find from the evidence that this association did not have the sum of $100,000.00 *bona fide* subscribed and actually paid up in lawful money of the United States, and in the custody of the persons named as the first board of directors. I find that the amount of money placed in the banks as aforesaid to the credit of the capital stock was procured almost entirely by and from the endorsement and negotiation of the Clark and Kinehan loans, by the A. J. Gillespie Commission Company and the $5,000 of Thisler's money as herein stated. I find from the evidence that the journal book offered in evidence showed under the head of capital stock the following names only: T. E. Gillespie, $10,000; J. T. Gillespie, $10,000; F. L. Dayton, $10,000; then follows seven entries of $10,000 each with no names set opposite at all. Then diagonally across this entry are two red lines drawn, cancelling the whole entry. The ledger account shows the National Bank of Commerce is charged with $30,000 capital stock and just below this entry is 'T. E. Gillespie, $10,000; F. L. Dayton, $10,000; J. T. Gillespie, $10,000,' making $30,000. Stock Yards Bank of Commerce is charged with $50,000, and 'good will' is charged with $20,000, making the $100,000. The 'good will' part is scratched out, and on November 20, 1898, an entry of $20,000 cash is placed in lieu thereof. The statements of the defendant Gillespies as to said $20,000 are to the effect that the same was paid at their request on November 20, 1898, by J. S. Hollinger, in order to make the $100,000 capital stock paid up. I find that

said ledger shows that, on November 20, 1898, Grant G. Gillett drew out $20,000, but from what particular source it is not shown. I find from the cash account that the $36,743 which was derived from the proceeds of the Kinehan notes was never entered as a cash item upon the cash book. The evidence of the defendants shows that the bank book balanced at the end of the month of October, and I further find from the evidence that this could only be done by placing the $36,743 in the amount charged to capital stock in the Bank of Commerce or the Stock Yards Bank of Commerce. The books of the Bank of Commerce showed that the proceeds of this Kinehan note went in as capital stock of the A. J. Gillespie Commission Company, but such proceeds did not appear in the cash account of the company, for otherwise the books of the bank would have been out of balance, just the amount of the check above mentioned as given by Hocker-Arnold-Woodson Brokerage Company to the A. J. Gillespie Commission Company. This is further borne out by the Kinehan account introduced in evidence, which does not show any credit to Kinehan on account of said note for the proceeds of the check given to the A. J. Gillespie Commission Company by Hocker-Arnold-Woodson Brokerage Company as stated aforesaid.

"I further find from the evidence that Grant G. Gillett by such operations as above stated received in loans and discounts through the A. J. Gillespie Commission Company the sum of $456,055.84, which was done by giving worthless notes to said company and having it endorse and negotiate the same to innocent parties.

"I further find from the evidence that J. S. Hollinger and his son, W. H. Hollinger, Joseph Hollinger, W. Hollinger, A. L. Hollinger and C. R. Hollinger, between October 3 and November 26, 1898, received on these notes through and from the A. J. Gillespie Com-

mission Company amounts as follows:    Joseph and W. H. Hollinger with J. S. Hollinger, endorser, $58,569.20; W. H. Hollinger, $32,943.50; A. L. Hollinger, $29,265.32; C. R. Hollinger, $26,000.

"I find from the evidence that the greater part of this said paper was owing to divers parties and outstanding at the time the articles of agreement were signed and the certificate issued by the Secretary of State as herein set forth, and that such paper fell due about the middle of October, 1898, and that by the direction of J. S. Hollinger the same were taken up and paid by the A. J. Gillespie Commission Company.

"I further find from the evidence that on November 16, 1898, J. S. Hollinger and Grant G. Gillett procured by checking on this company the sum of $10,000, and on October 17th J. S. Hollinger drew out of the funds of said company the sum of $35,000, being the proceeds of E. R. Clark's loan as above mentioned, and that said checks with the $146,778.02 above mentioned, makes a total of $191,773.02, received by the Hollingers through the A. J. Gillespie Commission Company between October 3 and November 26, 1898.

"I further find from the evidence that no money or its equivalent was ever put in said A. J. Gillespie Commission Company by the said Hollingers and that the said Grant G. Gillett and the said Hollingers used the said A. J. Gillespie Commission Company as a means to defraud the public, and to procure the above-stated sums of money, and that by the use of said means they did procure from various persons and banks the sums of $655,389.79 between the 3rd day of October and the 26th day of November, 1898.

"The evidence further showed that while Grant G. Gillett was not named as a stockholder, as a matter of fact, he and J. S. Hollinger were the real owners and controllers of said A. J. Gillespie Commission Company, and I further find from the evidence that

Grant G. Gillett was present and participated in the first meeting of the organization of this company, and that it never held but one meeting thereafter, and at that meeting the defendants herein tendered their resignations.

"I further find that the whole business of the A. J. Gillespie Commission Company was carried on and transacted under and by the direction of J. S. Hollinger. I further find from the evidence that the office of the A. J. Gillespie Commission Company was maintained in the State of Kansas and that no office was kept in the State of Missouri, where service could be had upon the company under the statute of the State of Missouri.

"I further find from the evidence that the A. J. Gillespie Commission Company had stock-pens assigned to them by the Kansas City Stock Yards Company on the Missouri side of the State line and that they did yard business in the State of Missouri.

"I further find from the evidence that said attempt to incorporate under the laws of the State of Missouri by the said Gillett and Hollinger was for the purpose of obtaining a charter to do business in the State of Kansas and for the purpose of cheating and defrauding the public who dealt with said company.

"I further find from the evidence that the defendants did not at any time intend to become *bona fide* stockholders of said company by paying their stock subscriptions therein; on the contrary, I further find from the evidence that they signed said articles of agreement with the understanding between them and the said J. S. Hollinger that they were not to pay any money for the stock subscribed by them, but were to be mere nominal stockholders for the purpose of enabling said Hollinger and others to procure articles of incorporation in Missouri. I find that defendants took no part in the management of the company, but

that such management was left entirely with J. S. Hollinger.   I further find that on or about November 26, 1898, said A. J. Gillespie Commission Company closed its doors and said J. S. Hollinger packed up its books and papers and carried them to Abilene, Kansas, his home, and that since then the bank books and stock book of the company have not been located.   I further find that said company left no money or property out of which its creditors could realize anything, and that at the time of its failure it was indebted to various banks and persons in about the sum of $750,000, and with no assets to pay such indebtedness.

"I further find that said G. G. Gillett executed the two notes sued upon in this case for $8,000 each, bearing date October 15, 1898, and that on or about October 19, 1898, the notes were endorsed by said The A. J. Gillespie Commission Company and sold to Hocker-Arnold-Woodson Brokerage Company and they, in turn, about the same date sold said notes to the plaintiff in this case, which acquired these notes for value long before maturity and that no part thereof has been paid to the plaintiff.   I further find that there were no cattle in existence such as are described in the mortgage securing said $8,000 notes and that said Gillett did not own any such cattle as is therein described, and by reason thereof the said mortgage was fraudulent and fictitious.

"I further find that the Secretary of State had no knowledge that said Stannard and Case had not signed said articles or authorized their names to be signed to said articles, at the time he issued said certificate set forth in the findings herein.   I further find that said Secretary of State did not know that said defendants in this case had not bona fide subscribed for the stock set opposite their names, and had not paid for the same.   That said Secretary of State did not know that said parties signing said paper intended to con-

duct said business in the State of Kansas and did not know that said proposed company was going to maintain its office and place of business in Kansas and did not know that said company was not going to keep its principal office in this State and in Jackson county, as set forth in said articles.

"I further find that said Secretary of State relied upon the statement contained in said writing filed with him, and believing the facts stated in said article to be true, issued said certificate as herein set forth.

"The above and foregoing findings of fact, asked by plaintiff, are given by me on this December 31, 1904.

"SHANNON C. DOUGLASS,
"Judge."

By this action it is sought to invalidate the incorporation of The A. J. Gillespie Commission Company, and to hold the defendants as partners upon the following grounds:

1.   That no valid agreement was ever entered into between the individuals named in the articles of agreement, to form a corporation, and that, therefore, there was no such organization in existence as set forth in said paper upon which the State could bestow a franchise.

2.   That the certificate of incorporation was granted to all the eleven persons named in the articles, as a body corporate, and not to as many as might choose to accept.

3.   That no such organization as set forth was in existence, or ever accepted such franchise or operated under same.

4.   That where a charter is granted to a certain number of individuals, creating them a body corporate, all must accept in order to become a body corporate.

5. That under the evidence and the findings of the court, these defendants and their associates were outside the organization described in the articles, and did not fit this charter.

6. That the evidence showed that the Gilletts, Dave Naill and J. S. Hollinger were the only parties who were really operating under said charter, while Patterson and the defendants were parties only in name.

The petition copies into it and makes part thereof the articles of incorporation, and alleges the issuance of the certificate of incorporation, but assails the incorporation upon the grounds before specified.

That the life of a corporation in no way depends upon the life of its incorporate members, or of those who from time to time may become interested in it, there can be no question. The members of a corporation, "as natural persons, are merged in the corporate identity." [Button v. Hoffman, 61 Wis. 21.] As was said in People ex rel. Winchester v. Coleman, 133 N. Y. l. c. 284, "the creation of the corporation merges in the artificial body and draws in it the individual rights and liabilities of the members," who thereafter can speak only through the officers and directors of the corporation. [Bank of U. S. v. Dandridge, 12 Wheat. 91; Bank of California v. San Francisco, 142 Cal. 276.] So that when the certificate of incorporation was issued by the Secretary of State, to the A. J. Gillespie Commission Company, and accepted by them, the individuality of the incorporators as such, and in respect of all business matters of the corporation, was merged in the corporation.

In Bank v. Rockefeller, 195 Mo. 15, it is held that the certificate of incorporation issued by the Secretary of State to a corporation is a final determination of its right to do business, and that thereafter no one except the State by a direct proceeding can question

its corporate existence.    In that case the judgment
was on a demurrer to the petition, which alleged "that
it was agreed that the capital stock of the company
should not in fact be paid up, and that pursuant to
that agreement the capital stock of said company was
not in fact paid up." In the case at bar all the stock
was paid in money, and it is not material for the pur-
poses of this investigation whether such money so paid
was obtained by fair and honest means or otherwise.
Plaintiff, however, insists that under the law declared
in that case the A. J. Gillespie Commission Company
was not a corporation *de jure* or *de facto,* because the
articles of agreement were not signed and acknowledg-
ed by all the parties thereto, and that a less number
will not do, in support of which contention plaintiff
quotes the following from the opinion in that case: "A
consideration of the sections of our statutes provid-
ing for the creation of business corporations will show
that the law has provided the steps which individuals
seeking to become incorporated shall take, to-wit, the
signing and acknowledging articles   of   association,
enumerating the purposes of the corporation, and re-
quiring the filing of these articles in the office of the
recorder of deeds of the county in which the corpora-
tion is to be located, and filing a certified copy in the
office of the Secretary of State.    These are the acts
which the law requires of those who desire to become
incorporated, but after all these things are done, still
there is no incorporation until the State, through its
Secretary of State, grants the certificate of incorpora-
tion, which takes the place of a special act of the Leg-
islature prior to our Constitution of 1875.    This cer-
tificate of the Secretary of State, then, is a grant of
a franchise to become a corporation, and without it
there can be no corporation under our laws.    The par-
ties to this grant are the State on the one hand and
the incorporators on the other, and when once issued

and accepted by the company, no one can dispute the corporate existence except the State in a direct proceeding.''

From this plaintiff argues that the act of the Secretary of State alone is not sufficient, but that prior to such grant there must have been certain acts by the parties, among which the signing and entering into articles of agreement in writing, and acknowledging the same. This corporation was assailed in the case of Ryland v. Hollinger, 117 Fed. 216, wherein the plaintiff sought to recover of the defendants, as copartners using the firm name of A. J. Gillespie Commission Company, and one Kinehan, upon several promissory notes all made at Kansas City, Kansas. The petition in that case alleged that ''though the person executing the said articles subscribed for stock of such corporation, they never intended to take and have not taken any of the stock, and have not and never intended to have any office of such corporation in the State of Missouri, but to have its only office in the State of Kansas, and that the notes in suit were made and delivered to the A. J. Gillespie Commission Company, and by that company sold and the proceeds received before any certificate of incorporation was issued by the Secretary of State.'' The purpose of that action was to hold some of those who signed the articles of association, but who really never took any stock in the corporation, upon the Kinehan notes referred to by the trial court in its finding of facts in this case; but a demurrer to the petition, upon the ground that they could not be held as partners, was sustained.

That case was approved by this court in Bank v. Rockefeller, supra, wherein GANTT, J., speaking for the court, said: ''The Circuit Court of Appeals of the United States for the Eighth circuit construed section 2492, Revised Statutes 1889, now section 955, Revised Statutes 1899, to mean that the existence of

a corporation formed under that section began when the Secretary of State issued the certificate of incorporation. Section 1314 provides when the grant of the State of corporate powers shall take effect, and that is upon the issuing of the certificate by the Secretary of State. In this manner the State has elected to show its assent to the creation of the corporation, and then the section further provides that this certificate by the Secretary of State shall without more be received by all the courts of this State as evidence of the corporate existence. This being, then, a grant of the State and by the State, it is not subject to be attacked collaterally by any other person and only by the State itself in a direct proceeding for that purpose. A charter thus obtained under our general law had all the force and effect of a legislative charter prior to our constitutional provision inhibiting the grant of special charters by the Legislature. But it is earnestly and ably urged by the learned counsel for the plaintiff that the acknowledgment of the articles of association by the incorporators is a condition precedent which must be performed before there can be a corporate existence under the statute. Unquestionably, both in legislative charters and in charters under general laws for the incorporation of companies, the statute itself often provides that the corporation shall not come into existence or have the capacity to do business until certain conditions precedent have been complied with, and in such cases unless the acts or things required to be done are done there cannot be a corporation. This is well illustrated in the case of Railroad v. Shambaugh, 106 Mo. 566, in which this court said: 'Where the act of incorporation does not in and of itself confer corporate capacity, but provides for the doing of certain things, upon the doing of which the company shall become a body corporate, the performance of these things constitutes conditions

precedent, and until performed the company has no corporate existence. [Granby Mining Co. v. Richards, 95 Mo. 110; Hammett v. Railroad, 20 Ark. 204; Lyons v. Railroad, 32 Md. 18.] If, however, the charter confers corporate capacity without any conditions precedent, acceptance of the charter is all that need be shown. In such cases the act of incorporation brings the corporate body into existence. The act of January 22, 1857, declares that there is hereby incorporated a company called the St. Joseph & Iowa Railroad Company with a capital stock of $2,000,000, and then goes on to designate the persons who shall constitute the first board of directors. No conditions precedent are prescribed. It is a present grant of corporate powers. The corporation came into being upon the acceptance of the charter.' "

There is no contention in this case that the incorporation papers were not in exact conformity to the requirements of the laws of Missouri, on the face thereof, or that the certificate of incorporation granted by the Secretary of State was not in due form. Under our laws the Secretary of State is not required to make inquiry outside the articles of association filed with him to determine whether the matters and things stated therein are in fact true, or that all conditions precedent have in fact been performed. If the papers, upon their face, conform to the requirements of the law, the Secretary of State is authorized, upon payment of the necessary fees, to grant the certificate of incorporation, and section 955, Revised Statutes 1899, provides that "a certificate by the Secretary of State, under the seal of the State, that said corporation has become duly organized, shall be taken by all courts of this State as evidence of the corporate existence of such corporation."

The validity of the corporation is also challenged upon the ground that the defendants were the only

persons signing the articles who resided in Missouri, and that the others were residents of Kansas, and that in procuring a charter in this State the object was to evade the laws of Kansas governing the liability of stockholders in a corporation organized in that State.

The evidence shows that the corporation did but a small portion of its business in Kansas. Besides, we understand it to be the universal doctrine that where citizens of one State desire to do business under a charter obtained in another State whose corporation laws seem to them more favorable than the laws of the State in which they reside, they have the right to do so upon compliance with the laws of such other State. There is nothing in our laws which forbids citizens of this State who have incorporated here to sell all their stock to non-residents. In this case some of those who were non-residents at the time of the incorporation moved into and became residents of this State, after which the defendants transferred their stock to them.

Plaintiff makes the point that said company had no office in Missouri. The evidence shows this to be the fact, and that such office, where the clerical work was done, was on the Kansas side of a building through which the State line ran. It seems that it was necessary for the corporation to have an office in this building to do business at the stock yards, being engaged in the stock commission business, and that it could not get an office on the Missouri side of the building at the time, all being occupied. It further appears that all the meetings of the stockholders and directors of the corporation were held in this building, but on the Missouri side of the State line. This was all that was necessary. [Missouri Lead M. & S. Co. v. Reinhard, 114 Mo. 218.] Moreover, the directors were the agents of the corporation, and it is well settled that they may hold meetings and transact any corporate business that

they may desire in a foreign State, in the absence of any statute, or any by-laws of the company, inhibiting the same.     [Morawetz on Private Corporations (2 Ed.), sec. 533; Taylor on Corporations (2 Ed.), sec. 381; Railroad v. McPherson, 35 Mo. 13; Handley v. Stutz, 139 U. S. 417.]

Of course, in investigating and passing upon the validity of the corporation, we cannot examine into its methods of business, or the acts of its several stockholders, or any of the matters and things which occurred after the certificate of incorporation was granted.

It is asserted that the corporation never elected a board of directors.     The record, however, shows that there was a first board of directors; that they met and chose a president, vice-president, secretary and treasurer; that the vice-president lived in Missouri, and that the other officers left their homes in Kansas and removed to Missouri when the corporation began to do business; that the directors adopted a seal and that the company carried on business as a corporation.

Plaintiff contends that the body never accepted the charter or acted thereon.     It is true that the charter in question was a contract between the State and the incorporators, and, like all contracts, to become an executed contract it was necessary that it should be accepted by the incorporators.     This, however, may be shown without any action being taken by any one for that purpose, and may be inferred from the use of the franchise.     "When the franchises are beneficial, there seems to be no particular reason why the assent to and acceptance of the same may not be inferred from the acts, as well as in the case of individuals."     [Bank of U. S. v. Dandridge, 12 Wheat. 72.] As was said in Zabriskie v. Railroad, 23 How. l. c. 397, "As between the parties on this record, the acceptance

209 Sup—17

of these acts may be inferred from the conduct of the corporators themselves. The corporation has executed the power and claimed the privileges conferred by them, and they cannot exonerate themselves from the responsibility, by asserting that they have not filed the evidence required by the statute to evince their decision.'' So it is held in Glymont Co. v. Toler, 80 Md. 289, that where persons incorporated under the general law, the fact that they ask for the franchise and do such things as may be necessary to get it shows its acceptance.

According to the authorities, it requires stronger proof of an acceptance when the corporation is created by a special act of the Legislature than when brought into being under the general law, as in this instance. Yet it was held in St. Joseph & Iowa Ry. Co. v. Shambaugh, supra, that as the charter, which was by a special act of the Legislature, prescribed no mode or time of acceptance, proof of acceptance might be inferred from use of corporate powers under the charter. [Hope Mutual Fire Ins. Co. v. Beckmann, 47 Mo. 93; 1 Morawetz on Priv. Corp., sec. 23.] So is it held in Furniture & Carpet Co. v. Crawford, 127 Mo. 356, that ''corporate existence becomes complete, under our statute, when the articles of association are filed in the office of the Secretary of State.''

While plaintiff does not contend that a person cannot sign articles of incorporation as trustee for another, it argues that Hollinger did not sign as trustee, or rather, that if he did so sign, he was unauthorized so to do, and that, therefore, his act was a nullity, even though he may have in fact paid the entire amount of the stock thus subscribed for. The findings of fact are to the effect that Hollinger signed the names of Case and Stannard to the articles of incorporation, without authority from either, and that the Secretary of State did not know this at the time he issued the

certificate.    The articles show upon their face that Hollinger signed and acknowledged as trustee for five persons named therein.    All named as beneficiaries, except Case and Stannard, admit he was their trustee. It seems that Hollinger has died since signing the articles.

If Hollinger, as trustee, subscribed for shares of stock in the corporation for persons for whom he was not in fact trustee, he thereby bound himself personally for the stock thus subscribed whether he really believed he was trustee or not.    In 1 Morawetz on Priv. Corp. (2 Ed.), sec. 304, it is said:    ''It is clear that no engagement or relationship between a shareholder and a stranger to the corporation can be allowed to affect the mutual rights and obligations existing between the shareholders by reason of their contract of membership.  .  .  .   It has accordingly been held that the legal owner of shares in a corporation is liable to the company for calls made upon the shares, though he be a trustee for  another person; and the beneficiary cannot be made responsible, for he is not a party to the contract from which the liability for calls arises.    For the same reason, it follows that only the legal owner of shares is entitled to vote at corporate meetings; and the *legal* title to dividends belongs to him also.    It is immaterial for this purpose whether the legal owner be an original subscriber, or a transferee of the shares; for a transfer involves a complete novation of the contract of membership, and the transferee steps into the place of the prior owner.'' Later on, in section 852, vol. 2, the same author says: ''The members of a corporation are entitled, as among themselves, to hold every person having the legal title to shares liable to perform all the duties of a shareholder; and a collateral agreement or trust existing between a shareholder and third persons cannot be allowed to alter the relation existing between himself

and the corporation. Hence it is clear that creditors are always entitled to compel the legal owners of shares to pay their unpaid stock subscriptions; for such stock subscriptions are a portion of the assets belonging to the company, and pledged to creditors for the payment of their claims. Moreover, creditors have an equitable right to hold the legal owners of shares liable, by reason of the direct relation existing between such shareholders and themselves. A corporation and its shareholders are in reality the same; and when the agents of a corporation create corporate obligations, they do so for the benefit of its shareholders, and on their behalf pledge the company's assets, including the liability of its shareholders, as security. To allow any agreement or relationship between the shareholders and third parties to impair the security thus given through the corporation, would be contrary to the agreement made with the creditors, and a violation of their equitable rights. It has accordingly been held that the creditors of a corporation are entitled to hold every legal owner of shares liable as a shareholder, without regard to equities existing between him and third persons, and may enforce not only the liability of such shareholder to contribute the portion of capital subscribed by him to the company, but also any further liability to creditors imposed by statute. This rule has been enforced against trustees holding shares for the benefit of others, and against persons to whom shares have been transferred as collateral security for a claim against the prior holder." To the same effect is Ollesheimer v. Thompson Mfg. Co., 44 Mo. App. 1. c. 184.

It is asserted by plaintiff in argument that the corporation was a "fraudulent scheme," entered into for the purpose of cheating and defrauding the public. It does appear from the evidence that the corporation was wrecked by the machinations and fraud perpetrat-

ed by Gillett, who, however, had no control over nor interest in the corporation except to the extent of $5,000 of stock purchased by him after it had been issued; but this does not show or tend to show that the corporation never existed. On the contrary, this purchase of stock by him tends to show that the corporation did in fact exist.

In Vinegar Company v. Foehrenbach, 148 N. Y. l. c. 65, it is said: "We did not intend to hold in the Schlegel case that any subsequent corporate act, manifesting, or tending to manifest, an illegal purpose on the part of the directors, might so retroact as of the time when parties were engaged in promoting the formation of the company as, in connection with their acts and declarations of like tenor, to affect the corporation itself with the vice of illegality. . . . Had the certificate of incorporation expressed any illegal purpose of its promoters, another and a very different question might be presented; but that is not this case. On its face, the transaction between plaintiffs and defendant was valid, and it is only by seeking to inject into it the alleged vice of subsequent corporate dealings that it can be said to be tainted, and, therefore, unenforceable. This is a distinction which has no support in the cases, or in principle."

As to the motives or intentions of the incorporators in obtaining from the Secretary of State the certificate of incorporation, we are of opinion that that cannot be inquired into in this action. It seems to us that if the plaintiff has any cause of action at all upon the facts disclosed by the record, it is upon the contract of indorsement, and not against these defendants individually.

It is also contended by plaintiff that, although the corporation was properly incorporated, the charter "did not fit the parties to the articles," but outside parties, unknown to the State at the time of the grant-

ing of the franchise, who wished the corporation created in order to swindle it; that the parties who were actually carrying on the business in the name of the A. J. Gillespie Commission Company were Joe Gillett, Grant Gillett, Dave Naill and J. S. Hollinger, with Patterson and these defendants as mere dummies; that, hence, the body actually operating under this charter was entirely outside the charter.

We must confess our inability to see the application or force of that argument or reasoning. Here we have a corporation completely organized, with all its stock issued and paid for, and having a board of directors, officers, and an official seal; and the notes upon which this suit is predicated are endorsed by the president of the corporation in his official capacity.

Booth v. Wonderly, 7 Vroom 250, is relied upon by plaintiff as supporting its position, but that case is not analogous to this. In that case there was a special act of the Legislature for the purpose of creating an insurance company to do business in Trenton, New Jersey. The court said: "This charter seems to have been in the market at Trenton, without any organization under it, up to the time of the bargain between Logan and Noble. No connection was shown in any way between the corporators named in it and Noble, or those who attempted to organize under it in Jersey City. As the evidence stands, there was no organization in Trenton, no stock subscribed or paid in, or any effort to do business there at any time. There was a meeting at Trenton at the time Logan made the purchase, at which Noble says Logan, Masters, Booth, and himself, and he thinks, two others were present, not one of them a corporator named in the act. . . . The evidence shows that nothing was done there at that meeting towards any organization at Trenton, either by an election of directors, subscription to stock, or otherwise, but that Logan and Noble, at least, expected

and intended that the company should be organized and established at Jersey City. . . . The name assumed was not the name in the charter, the word *Mutual* being left out.'' The court in that case held that the company could not be established in Jersey City instead of Trenton, under a charter for such company to be located at Trenton; that it was a perversion of and a fraud upon the act, and gave no corporate color to the company for the protection of those who were engaged in or lent themselves knowingly to the scheme, and that such an organization in Jersey City was entirely outside the act, and had no existence as a corporation, real or *de facto*. No such state of facts is shown to exist in this case.

Plaintiff as the vendee of the Hocker, Arnold & Woodson Brokerage Company, who was the endorsee of the A. J. Gillespie Commission Company, in suing upon said notes, recognized the incorporation of said A. J. Gillespie Commission Company, and is now estopped to deny the same. Moreover, whatever may be the rule in other jurisdictions, we understand the law in this State to be that a certificate of incorporation issued by the Secretary of State is a final determination of the corporation's right to do business as such, and that, thereafter, the State only, by a direct proceeding, can challenge its corporate existence or its right to do business as a corporation, even though fraud should be practiced upon the Secretary of State in obtaining the certificate. Nor, should the corporation or its incorporators fail to comply with the conditions or duties subsequent to the granting of the certificate, would that invalidate the incorporation or render the incorporators liable as partners or as individuals.

Our conclusion is that the court committed error in refusing the declarations of law prayed for by de-

fendants, and in rendering judgment against instead of for them.

The judgment is reversed.    All concur.