**SWISS–AMERICAN IMPORTING COMPANY, a Corporation, Plaintiff-Respondent,**

v.

**VARIETY FOOD PRODUCTS COMPANY, a Corporation, Defendant-Appellant.**

No. 33090.

St. Louis Court of Appeals.

Missouri.

Dec. 17, 1968.

Motion for Rehearing or to Modify Denied Jan. 23, 1969.

Derrick & Holderle, and Tyree C. Derrick, St. Louis, and Moss Silverforb, Kansas City, for defendant-appellant.

Israel Treiman, Gary S. Heifetz, Shifrin, Treiman, Schermer & Susman, St. Louis, for plaintiff-respondent.

CLEMENS, Commissioner.

This suit is for injunction, accounting and damages arising from the asserted breach of an exclusive sales territory contract, brought by a jobber against a distributor. The plaintiff-jobber prevailed. The trial court restrained the defendant from continuing to sell certain food products to other jobbers in the plaintiff's territory and gave plaintiff $3,191.38 damages for lost profits. (The corporate plaintiff

was, without objection, substituted as a party plaintiff for the three original partner-plaintiffs.)

Three issues are before us. Did the defendant breach the exclusive sales territory contract? Did the plaintiff partners terminate the contract by incorporating their business when the contract provided for cancellation if either party should "sell his business"? And, on trial, did the court lead the parties to believe that the amount of plaintiff's damages was not yet an issue?

Giving due regard to the trial court's better opportunity to judge the credibility of witnesses, and to its specific findings on the principal fact issues, we have ourselves considered the evidence and find these to be the facts:

In April, 1965, the original plaintiffs, Joe, Karl and Max Weil, were doing business as partners under the name Swiss-American Importing Company in St. Louis, selling specialty foods to chain and independent grocery stores. The defendant distributed "La Tiara" brand Mexican foods from its plant in Kansas City, managed by its executive vice-president, Joseph Catalano.

On April 9, 1965, responding to a letter from Karl Weil, Joseph Catalano visited plaintiff's St. Louis office. Max Weil, acting for the partners, and Joseph Catalano, acting for defendant, then signed this memorandum prepared by Max Weil:

"As per our conversation we confirm exclusive distribution on La Tiara Taco Shells and La Tiara Beef Taco Filling for a period of Five years by your firm.

"It is understood that you will promote the two products at all times and will not handle anything competitive to the two items.

"Your exclusive area is 25 miles west into Missouri, North & South and the Southern counties of Illinois, bordering the East Missouri border.

"This agreement may be renewed or cancelled at the end of 5 years by either party. It is further agreed that should either party sell his business this agreement would be cancelled."

On the same paper Mr. Catalano wrote the prices of the products and discount rates for brokerage allowance and promotion. He had urged Max Weil to take on a third product, defendant's La Tiara taco sauce, but Mr. Weil said no, since Swiss-American was already handling "El Paso" brand taco sauce. So the memorandum was limited to the two products, defendant's taco shells and taco meat filling.

The parties promptly started doing business, the defendant supplying and Swiss-American selling the taco shells and filling. Swiss-American's salesmen took samples into stores in the exclusive area; they included the products in order forms sent to their customers; they created a market in the exclusive area. In the first seven or eight months Swiss-American sold some $4,000 worth of the defendant's two products.

Beginning in August, 1965, the defendant showed misgivings over Swiss-American's exclusive sales rights. Defendant wanted Swiss-American to add defendant's taco sauce to its line, and by letter Mr. Catalano asked Swiss-American to get "off the hook" with the maker of El Paso taco sauce. A month later Mr. Catalano warned Swiss-American that item was creating an "impassable breach between us." Then on December 8, 1965, he wrote Swiss-American that because of "many inquiries" in the St. Louis area for all of defendant's products it was looking for other jobbers and was renouncing Swiss-American's exclusive sales rights. Swiss-American protested. That same month defendant began to sell—and by trial time had sold—substantial amounts of La Tiara taco shells and filling to another jobber, Carlstrom Foods, Inc., one of Swiss-American's St. Louis competitors. Carlstrom sold these prod-

ucts to many of the same grocery stores to which Swiss-American had sold.

Defendant kept on trying to get Swiss-American to release the exclusive sales agreement. On March 1, 1966, Mr. Catalano suggested that defendant furnish Swiss-American with taco shells, filling and sauce under Swiss-American's own label. (By then Swiss-American was selling defendant's taco sauce, as defendant had originally requested.) Swiss-American showed interest in this plan until March 8, 1966, when Mr. Catalano wrote more in detail about Swiss-American's private label. He wrote this letter under the fictitious name "Gladstone Food Products Company", saying: " * * * inasmuch as Variety Food Products Company [the defendant] is not in the picture, as such, the aforementioned exclusive contract would naturally be considered null and void." Swiss-American protested promptly, insisting on doing business only with the defendant, not with Gladstone, and reasserting its exclusive sales rights.

In June, 1966, defendant began to sell—and by trial time had sold—substantial amounts of La Tiara taco shells and filling to still another jobber, Wetterau Foods, Inc., a franchised distributor for IGA stores in St. Louis. When Wetterau obtained defendant's two products, IGA stores became obliged to buy from Wetterau and no longer bought from Swiss-American.

Despite all this, Swiss-American continued to buy and sell defendant's products, but in decreasing amounts since the other two jobbers were also selling them to Swiss-American's customers.

■ We hold that by this conduct defendant breached the parties' contract on December 8, 1965. That was the day defendant renounced Swiss-American's exclusive sales rights and then began shipping La Tiara taco shells and filling to Carlstrom Foods for sale to retailers in Swiss-American's territory. It follows that plaintiff established the right to damages arising after that date. (See Restatement of the Law, Contracts, § 329; and 25 C.J.S. Damages § 74.)

Having determined defendant's breach, the trial court enjoined it from selling La Tiara taco shells and filling to anyone but plaintiff in the specified sales area until April 9, 1970, the expiration date of the five-year contract. Defendant challenges plaintiff's right to injunction, urging that the plaintiff partners by incorporating on January 4, 1967, terminated the exclusive jobbing contract; that by trial time, six months later, there was no contract and, thus, no basis for injunction.

Recall that the parties' memorandum contained this provision: "It is further agreed that should either party sell his business this agreement would be cancelled."

On January 4, 1967 (three months after filing suit and six months before trial), the three partners formed a new corporation, the Swiss-American Importing Company. Each took a proportionate share of the new corporation's stock and became a director. The partners transferred the partnership assets to the new corporation; the contract with defendant, as well as the partners' interest in the present suit, was also transferred to the corporation, which assumed the partnership obligations. Plaintiff's counsel explained the transaction to the trial court: "The accountant prepared an opening statement for the new corporation, which listed all the assets of the company and its net worth. The corporation then issued stock to the stockholders who were the former partners, in exchange for their respective interests in those assets, so that the stock of the corporation was sold to them, turned over to them in exchange for these assets."

■ By this act of incorporation, the legal interests of each partner shifted and merged into the corporation; thereby the partners introduced a new entity into the contractual relationship with defendant. (Boatmen's Bank v. Gillespie, 209 Mo. 217, 108 S.W. 74, 1. c. 82.)

The defendant contends that since the partners' act of incorporation was a sale the contract was cancelled before trial time and, hence, plaintiff was not entitled to the injunction. This poses the issue: Did the partners' act of incorporation constitute a *sale* within the clause of the contract, "should either party sell his business this agreement would be cancelled"?

■ Bearing in mind that the memorandum was expressed in lay rather than legal language, we believe the quoted clause expressed the parties' mutual desire to do business only with each other and not with some third party; that if either party sold his business, each was thereby released from the contract. True, this gave each party a unilateral right to terminate the contract by the simple act of "selling his business". But, as in the case of Burns v. Beeny, Mo.App., 427 S.W.2d 772 [7, 8], "[t]he termination clause in question is no doubt unusual; however it is not unique." We said there:

"In our present case the parties have not agreed simply that one or the other shall have the privilege of terminating the contract; unless one does not equal one in the English language, they have agreed that the contract shall be no more upon the happening of a named event. If parties agree that the happening of that event shall work a change in their legal relations it is certainly their privilege to do so as long as freedom of contract exists. Until some public policy is violated, the validity of such a contractual arrangement will be sustained, no matter how unusual or bizarre."

Back to the crucial issue: Did the act of incorporating constitute a sale? We say yes.

By the partners' act of incorporation they transferred their individual property interests to the new corporation, which thereupon properly issued its stock in exchange. (Article XI, § 7, Mo.Const. 1945; § 351.160, V.A.M.S.) The partners' property interests were received by the new corporation "as the equivalent of money." (Luehrmann v. Lincoln Trust & Title Co., Mo., 192 S.W. 1026 [1].)

■ This exchange of partnership property for corporate stock was a "sale" as that term is broadly defined. In Schulte v. Crites, Mo.App., 300 S.W.2d 819 [2], the court said: "A sale ordinarily is defined as a contract to transfer property rights for money paid or promised to be paid, but the term is broad enough to include the transfer of property for any sort of valuable consideration." And in Kennerly v. Somerville, 68 Mo.App. 222, l. c. 225, the court tersely said: "Moreover, there is no substantial distinction between a sale and an exchange. In both cases the title is absolutely transferred and the same rules of law govern each."

■ We hold that by the partners' transfer of their interests in the partnership property to the new corporation in exchange for its stock, the partners sold their business. They thereby terminated the contract with the defendant. From that moment—January 4, 1967, half a year before trial—the contract was dead and, hence, at trial time there was no right enforceable by injunction.

To support its contention that the partners' act of incorporating was not a sale, the corporate plaintiff cites three authorities for analogous reasoning. It first cites Bittker, Federal Income Taxation of Corporations and Shareholders (2d Ed. 1966), at page 66, for the proposition that the partners' transfer to the corporation merely worked a change of form. This may be true for the limited purpose of determining the partners' income tax liability. The authority does not deny that such a transfer is a sale; it only denies that it creates taxable income.

Next, plaintiff cites Dodier Realty & Inv. Co. v. St. Louis Nat. Baseball Club, 361 Mo. 981, 238 S.W.2d 321, 24 A.L.R.2d 683, but that case is hardly analogous.

There it was held that the merger of a corporate lessee into another existing corporation was not an assignment of the lease. That conclusion, however, was based squarely on the fact that the merger, under § 351.450, RSMo 1949, occurred by operation of law rather than by an overt act. (See l. c. 325 [4].) Here, transfer of the partners' property to the new corporation was by their overt act, not by operation of law. Last on this point the plaintiff cites National Dairy Products Corp. v. Carpenter, Mo., 326 S.W.2d 87, holding that the transfer of ownership of motor vehicles from subsidiary corporations to their parent corporation arising from a merger of the corporations was not a sale for purposes of imposing Missouri's sales tax. As in the Dodier case, the court held that transfer of ownership of the automobiles arising from the merger was by operation of law and that there was no taxable sale. Nothing in either the Dodier case or the National Dairy case detracts from our conclusion that the transfer here was a sale.

Holding as we do that the contract was terminated by the partners' act of incorporating on January 4, 1967, their exclusive sales rights in the restricted area then came to an end. The trial court erred in granting plaintiff injunctive relief extending its exclusive sale rights beyond that date.

Back to the damage issue: We have held that by defendant's breach of the contract plaintiff became entitled to damages arising therefrom. Defendant contends, however, that on trial the *amount* of damages was not then considered by either party or by the trial court to be in issue, and for that reason was not fully developed. The plaintiff agrees, and we concur for the following reasons.

■ Recall that by its petition the plaintiff pleaded the breach of contract and prayed for (1) an injunction, (2) an accounting, and (3) damages arising from the breach. To establish its right to an injunction the plaintiff had to go beyond a mere showing that defendant had breached

the exclusive sales contract; plaintiff had to show that substantial damages flowed from the defendant's continuing to sell to plaintiff's competitors. (Putnam v. Coates, 220 Mo.App. 218, 283 S.W. 717 [3].) To this end plaintiff introduced some evidence showing the amounts of sales and profits before and after the breach. But the trial court's statements led both parties to believe the court was concerned only with the fact of substantial damages, not the precise amount.

■ Thus, on examination of plaintiff's first witness, Max Weil, when he attempted to testify from records to support his statement that plaintiff's business had declined after the breach, the court stated that details were unnecessary; that all the court then needed to know was the likelihood of plaintiff's injury if defendant continued to breach the contract. This limited purpose of evidence about damages was confirmed when plaintiff's next witness, Joe Weil, was asked about details of competitors' sales. The trial court sustained defendant's relevancy objection, stating: " * * * I am not going to assess any damages, I am certain, in this trial. We are going to determine whether the contract is valid, whether it's still binding, whether it has been breached, whether there ought to be an injunction against continued breach of it, and whether there ought to be an accounting." These statements convinced the parties that the issues then on trial did not include a final determination of plaintiff's damages. The court's award of $3,191.38 damages to the plaintiff was premature, and must be set aside so the amount can be fully developed on retrial.

In summary, we hold that (1) the defendant breached its contract on December 8, 1965, thereby giving plaintiff a right to damages arising from the breach—and an accounting if on remand the trial court finds that necessary to determine the amount of plaintiff's damages; and (2) the contract was terminated on January 4, 1967, the date of plaintiff's incorporation,

and plaintiff is not entitled to injunctive relief beyond that date.

The judgment is reversed and the cause is remanded for a new trial on the sole issue of plaintiff's damages.

PER CURIAM:

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, the judgment is reversed and the cause is remanded for a new trial on the sole issue of plaintiff's damages.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.