In the Matter of AMERICAN MAGNE-
SIUM COMPANY, Debtor.

OZARK–MAHONING COMPANY,
Appellee,

v.

AMERICAN MAGNESIUM COMPANY,
Debtor, Appellant.

No. 73–1479.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1974.

Rehearing and Rehearing En Banc
Denied March 14, 1974.

James L. Kincaid, Lynnwood R. Moore, Jr., Tulsa, Okl., Joe V. Boerner, Jr., Lubbock, Tex., for appellant.

Harold P. Brown, Charles B. Jones, Lubbock, Tex., for appellee.

Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

PROCEDURAL HISTORY

American Magnesium [1] filed a petition requesting institution of proceedings for

1. The present entity, American Magnesium, was originally an enterprise of Roger M. Wheeler, which he later incorporated in Oklahoma under the name of American Magnesium. He was the sole owner of both. In 1968, Wheeler formed a Delaware corporation, American Magnesium Corporation, which acquired all the assets of Oklahoma American Magnesium by merger. The present stockholders of American Magnesium are National Steel Corporation, Mr. Wheeler, Bovaird Supply Co., Missouri, Kansas and Oklahoma Lines, Inc., and John E. Barry, who also are holders of American Magnesium's promissory notes in substantial amounts which they will cancel under the terms of the plan of arrange-

an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq. After proper notice was given, a confirmation hearing was held. One creditor, Ozark-Mahoning, objected to the confirmation but was overruled. The bankruptcy judge confirmed American Magnesium's plan but was then reversed by the Federal District Court for the Northern District of Texas. American Magnesium appeals. We reverse the decision of the district court.

## FACTUAL HISTORY

In October of 1965, American Magnesium and the Ozark-Mahoning Company entered into a joint venture for the purpose of producing magnesium and acquiring leases of magnesium chloride brine deposits in Borden County, Texas, to provide brine from which the metal could be produced. In July of 1967, Ozark and American Magnesium terminated their joint venture and agreed upon a division of its properties. An agreement was entered on September 20, 1967, whereby American Magnesium would pay Ozark $137,879.00 for Ozark's interest in the joint venture. This included brine leases, rights-of-way, options and personal property. In addition

to this immediate exchange of consideration, Ozark agreed to refrain from purchasing, leasing or otherwise acquiring any rights in land within the brine reservoir and to refrain from entering into the business of producing magnesium or magnesium chloride for a period of ten years. American Magnesium agreed to pay Ozark a royalty of $1.00 per short ton of magnesium chloride which might be recovered by American Magnesium from the brine taken from leases within a 21 mile radius of Gail, Texas, processed at American Magnesium's Snyder, Texas, plant. In effect, the total output of that plant was subject to this royalty agreement. This agreement further stated that American Magnesium's obligation to make payments to Ozark could be terminated at American Magnesium's option in the event of sale of its brine leases, plant, and certain related assets. Any considerations received in such a sale by American Magnesium which was in excess of the cost and expense of American Magnesium would be divided equally with Ozark. It was also required that Ozark execute and deliver to American Magnesium an appropriate release of its royalty interest in the event of such termination.[2]

ment if it is confirmed. Mr. Wheeler is president of Delaware American Magnesium.
For the purpose of this appeal, the term American Magnesium shall apply to all three of these entities because, in effect, they were the same enterprise which simply changed its name and form on two occasions.

2. The release executed by Ozark-Mahoning and given to American Magnesium is set out in its entirety below:

Tulsa, Oklahoma<br>September 20, 1967

Ozark-Mahoning Company
1870 South Boulder Avenue
Tulsa, Oklahoma
Gentlemen:
In consideration of the mutual covenants and agreements hereinafter set forth, you and AMERICAN MAGNESIUM COMPANY, an Oklahoma corporation ("American") hereby agree as follows:
1. You agree to sell, convey, assign and deliver to American, and American agrees to purchase and receive from you, all of your rights, titles and interests in and to

(a) all brine leases, options for the acquisition of brine leases and other leases, options for leases, and rights in land located in Borden County, Texas;
(b) all easements and rights of way and options for the acquisition of easements and rights of way located in Borden and Scurry Counties, Texas;
(c) all wells, equipment and personal property located upon the properties described above; and
(d) all other rights, titles and interests of every kind and character acquired by or for or on behalf of the Ozark-Wheeler Joint Venture and acquired by you as a result of the termination of said Joint Venture as of July 31, 1967.
You agree, within 10 days after the date hereof, to execute and deliver to American conveyances and assignments, in recordable form where appropriate, of the property hereinabove described. Such conveyances and assignments shall be without warranty of title, express or implied, and may make appropriate reference to the royalty payable to you as hereinafter provided for in order to charge

third parties with notice of the existence of such royalty.

2. In consideration for such sale, conveyance and assignment, American has paid to you concurrently herewith $137,879, the receipt of which is hereby acknowledged by you, and, in addition, American further agrees to pay to you the royalty hereinafter described.

3. American agrees to pay you a royalty of $1.00 per short ton of 2,000 lbs. on a dry basis of all magnesium chloride recovered from any and all brines and waters found in, under or that may be produced from the Brine Reservoir (as hereinafter defined) and processed, saved and sold from facilities which may hereafter be constructed in Borden County or Scurry County, Texas, and in which American owns an interest. Such royalty shall be in full payment and settlement for all magnesium chlorine, bromine, boron, potassium chloride, calcium chloride and all other salts, minerals, metals and elements derived from any waters or brines found in, under or produced from the Brine Reservoir. Subject to the provisions of paragraph 4 hereof, the foregoing royalty shall be perpetual, shall be a covenant running with all rights and interests in all land, contracts or other sources from which brines or waters are derived from the Brine Reservoir (and American shall, upon request, make appropriate assignments of such royalty interests to you with respect to all rights and intersts in all land, contracts or other sources from which brines or waters are derived from the Brine Reservoir which American at any time may acquire so as to vest in you the full legal and economic title to such royalty interests) and the obligations therefor shall be expressly assumed in writing by the successors and assigns of American, in default of which American shall remain liable for the payment thereof. Such royalty shall be payable to you monthly by the 20th day of each calendar month on the basis of all magnesium chloride sold during the preceding calendar month. Your representatives shall have the right at any reasonable time to inspect and make copies of the books and records of American pertaining to the production and sale of magnesium chloride. "Brine Reservoir", as herein used, means any and all lands lying within a circle with a radius of 21 miles of which the Town of Gail in Borden County, Texas is the center.

4. In the event American shall at any time hereafter sell all of its Operating Interests (as hereinafter defined) in the Magnesium Property (as hereinafter defined), American shall have an option to terminate, effective as of the effective date of such sale, the royalty described in paragraph 3 hereof. Such option shall be exercised by notice of such termination given to you within 30 days after such effective date. In the event of such termination, and in the event the consideration (of every kind) received by American for such sale shall be in excess of the aggregate of (i) all costs and expenses of American relative to the Ozark-Wheeler Joint Venture (which Joint Venture was terminated as of July 31, 1967), and (ii) all additional costs and expenses of American relative to the Magnesium Property (whether heretofore or hereafter incurred), then and in such event, American shall divide equally with you that portion of such consideration which shall be in excess of the foregoing amounts.

(a) "Operating Interests", as herein used, means all right, title and interest in and to the Magnesium Property other than a royalty interest, overriding royalty interest, net profits interest or similar interest which does not entitle the owner to participate in the management or operation of the Magnesium Property;

(b) "Magnesium Property", as herein used, means brine leases and options for the acquisition thereof, easements and rights of way and options for the acquisition thereof, and any plant and related facilities which may hereafter be constructed for the production of magnesium metal, all of which are or shall be located in or in the vicinity of Borden County, Texas.

In the event of termination of such royalty interest you agree to execute and deliver to American, at the request of American, an appropriate recordable release thereof.

5. You agree not to purchase, lease or otherwise acquire, either alone or in conjunction with others, directly or indirectly, any lands or rights in land within the Brine Reservoir (other than as provided in paragraph 3 hereof) and not, either alone or in conjunction with others, directly or indirectly, to enter into the business of producing magnesium metal or magnesium chloride for the production of magnesium metal, for a period of 10 (ten) years after the date hereof.

6. That certain letter agreement dated September 1, 1967, accepted September 5, 1967, by and between Roger M. Wheeler and Ozark-Mahoning Company, a copy of which is attached hereto and marked Exhibit A for reference, is hereby canceled, terminated and rescinded.

7. American hereby assumes and agrees to pay all unpaid amounts which you are obligated to pay to American and/or third parties pursuant to the provisions of paragraphs 3 and 8 of the letter agreement dated January 31, 1967, by and between American and you by which the Ozark-Wheeler Joint Venture was terminated, a copy of which paragraphs 3 and 8 is attached hereto and marked Exhibit B for reference.

8. Any notice required or permitted to be given hereunder shall be given by registered

As a practical matter, the leases which were assigned from Ozark-Mahoning to American Magnesium were never used. It is important to understand that this was a royalty interest in production of a manufacturing plant. Here the interests were in the production of the plant and not in production from the land—this is not an overriding royalty interest in an oil or gas lease. In 1971, American Magnesium was deeply in debt, it had borrowed millions of dollars from its stockholders and was unable to continue in business because of the lack of operating capital. These investors then formed a joint venture. The purpose of this joint venture was to put American Magnesium back on its feet. The only thing American Magnesium contributed was its operating assets. None of its debts or obligations were assumed by the joint venturers. There was no actual conveyance by American Magnesium of any of its property. The enterprise was merely a temporary undertaking in order to shore up American Magnesium. There was further need for additional capital, and in January of 1971, the joint venture agreement was amended and two more parties entered into the joint venture contributing additional capital.

On September 14, 1972, another financial crisis struck American Magnesium. The plant was shut down by reason of a major fire; also, the magnesium extraction process in use was not working properly. At this time, however, none of its stockholders or the joint venturers involved were willing to contribute additional capital. In order to continue operating the plant, keep the employees on the job, and recoup some of the joint venturers' investments, American Magnesium proposed a plan of arrangement

mail, postage and registration charges prepaid, addressed to the party to be notified as follows:

Ozark-Mahoning Company
1870 South Boulder Avenue
Tulsa, Oklahoma
American Magnesium Company
% Roger M. Wheeler
The Telex Corporation
41st and South Sheridan Road
Tulsa, Oklahoma

The date of such notice shall be the date of mailing. The address of either party for purposes hereof may be changed by notice given in the manner hereinabove provided.

9. You agree to pay any documentary stamp taxes incurred by reason of the foregoing sale and conveyance.

10. Ad valorem taxes covering the properties and interests sold to American hereunder shall be prorated to the date hereof.

11. The terms and provisions hereof shall bind and shall inure to the benefit of the parties hereto and their successors and assigns.

If the foregoing correctly reflects your understanding of our agreement, please sign in the space provided below and this letter shall constitute an agreement between us.

Very truly yours,

AMERICAN MAGNESIUM COMPANY

By _____
President

ACCEPTED AND AGREED TO:

OZARK-MAHONING COMPANY

By _____
President
Vice Chairman

under Chapter XI of the Bankruptcy Act whereby American Magnesium would withdraw from the manufacturing of this metal. Under the plan, all of American Magnesium's assets would go to a new joint venture made up of some of the previous joint venturers and others. In essence, National Magnesium, a subsidiary of National Steel, decided to take over the operation and agreed to contribute substantial capital to make the plan work. The plan of arrangement called for the cancellation of all notes held by the previous stockholders of American Magnesium and some of the joint venturers, totaling $8,300,000.-00, and formation of a new joint venture with American Magnesium completely out. American Magnesium would no longer engage in any of the business as it had done in the previous joint venture. In return for American Magnesium's contribution of all of its assets, the joint venture would assume all of American Magnesium's obligations, including a 2.2 million dollar mortgage. All executory contracts would be assumed by the joint venture with the exception of the Ozark-Mahoning royalty contract, which would be terminated as provided in the agreement. After the plan was confirmed and acceptances were filed by all of the creditors affected, the district court reversed the confirmation of the bankruptcy judge based upon two contentions made by Ozark-Mahoning.

## THE BANKRUPTCY PROCEEDINGS

The pertinent determinations by the bankruptcy judge were, first, that the September 20, 1967, agreement between Ozark and American Magnesium was executory and therefore could be rejected under Chapter XI of the Bankruptcy Act. Second, the bankruptcy court ruled that the assignment of assets by American Magnesium to the joint venture in consideration for the joint venture's assumption of most of American Magnesium's liabilities as provided for in the

plan of arrangement was a sale within the context of the royalty termination provision of the September 20th agreement. The district court reached the opposite results on both these issues. Ozark naturally asserts that the district court was correct on both grounds. First, Ozark contends that the September 20, 1967, contract between American Magnesium and Ozark had been fully executed and cannot be terminated at the time of the bankruptcy arrangement. Second, Ozark asserts that the terms of the plan of arrangement whereby American Magnesium transfers all its assets to the other joint venturers in return for assumption of American Magnesium's debts is not a sale and therefore cannot serve as a basis for cancelling the Ozark-American Magnesium royalty agreement contained in the above-mentioned contract.

## THE CONTRACT

■ The key as to the contract issue is simply whether the contract between American Magnesium and Ozark dated September 20, 1967, is an executory contract for the purposes of 11 U.S.C. § 757(2). There is no doubt that an executory contract may be rejected in a bankruptcy proceeding. 11 U.S.C. §§ 110(b), 706(4), 757(2).

Ozark urges, first, that there was no true contract for the bankruptcy court to consider, much less an executory one. Ozark grounds this contention upon the premise that this contract was one dealing only with a fractional portion of mineral rights which, according to Ozark, constituted a royalty on real property rights. Therefore, contends Ozark, this contract must be governed by the substantive law of Texas. Then Ozark states that because any interest conveyed in Texas must be by deed and because all deeds are regarded as the final expression of the agreement between the parties, no true contract existed for the bankruptcy court to consider. The reason no contract existed, says Ozark,

is because the agreement to pay royalty interest and the non-competitive agreement were in fact two separate documents, dated September 20 and September 17, 1967, respectively. The non-competitive contract, Ozark asserts, is not only separate from the royalty agreement, but also it is not pertinent to the rights of the parties involved in the bankruptcy proceeding and, therefore, cannot be considered. This contention must be rejected. The agreement in question provided for much more than the assignment of interest in mineral leases in return for cash payment. It also provided that Ozark was to receive a royalty on every short ton of magnesium that American Magnesium produced from its Snyder, Texas, plant. This royalty payment was in no way tied to the lease interest previously held by Ozark. It was a payment on all magnesium produced. In other words, this was an interest in the total production of the plant and not an interest in production from specific mineral leases. Furthermore, Ozark agreed not to purchase brine leases in this area for a period of ten years. These factors clearly remove the contract in question from the realm of a real property executed contract. This is not a situation where an interest in land was conveyed for a fixed consideration. Much more was involved here.

■ Both the rule in Texas and in the majority of other jurisdictions is that a contract is executory when something remains to be done by one or more of the parties. An executory contract is one in which a party binds himself to do or not do a particular thing, whereas an executed contract is one in which the object of the agreement is already performed. Farrington v. Tennessee, 95 U.S. 679, 24 L.Ed. 558, Fletcher v. Peck (U.S.) 6 Cranch 87, 3 L.Ed. 162. An executory contract is obviously what this court is faced with. Ozark agreed to transfer all its interest in certain leases to American Magnesium and further agreed to refrain from purchasing other releases in this specific area. American Magnesium agreed in return to immediately pay Ozark a cash amount ($137,879.00), and also to pay Ozark a royalty on all magnesium produced in the Snyder plant. Both parties had ongoing commitments. There is no point at which it could be said that the contract was completed. Furthermore, it should be noted that Ozark acknowledges on appeal that the contract between itself and American Magnesium was indivisible while at the same time trying to circumvent that fact by invoking the doctrine of merger. The court has examined this contention and found it to be without merit. Ozark also urges several contract interpretation arguments on the court which, when examined, are found to lack substance and to be totally without foundation.

This court then finds that a contract did exist, it was executory, and the bankruptcy judge was correct in allowing its rejection.

## THE SALE

■ The next essential issue facing this court is whether the assignment of assets to the joint venture constituted a sale within the context of the agreement such that the debtor may elect to terminate the royalty payment. It does not appear to this court that there can be any doubt that the assumption of over two million dollars of indebtedness by the joint venturer in exchange for assignment of certain assets is a sale under the proper legal definition. See 1 Williston on Contracts § 99–137(a), 3rd Edition, 1957. Ozark contends that no sale took place, but only a transfer of a possible reversionary interest. That is to say the sale by American Magnesium to the subject joint venture of only a reversionary interest is not that sale which was envisioned in the original contract. Ozark then contends that this should be obvious from the face of the contract and, further, that the intent of the parties should prevail. This court has examined that contract and does not find such to be obvious. Furthermore,

Ozark's contention is utterly without foundation. American Magnesium, however, does appear to have substantial legal authority in its favor. See Childress v. Hinch, 162 Okl. 296, 20 P.2d 571 (1933), and Swiss-American Import. Company v. Variety Food Prod. Co., 436 S.W.2d 770 (Mo.App.1969).

If, for no other reason, Ozark's argument that no sale took place must be rejected because if American Magnesium had given notice of termination of the royalty agreement in 1970, when the joint venture was created, and had that joint venture been successful Ozark would certainly have been very unhappy about American Magnesium's profits while managing the formerly American Magnesium-Ozark assets. Ozark's objection at that point would have been tenable because as of 1970 American Magnesium did retain a management interest. Ozark's position now would thus require the court to conclude that having entered the joint venture, American Magnesium could never engage in a sale. That conclusion would then restrict the available means of attempting to recoup losses in any situation governed by analogous contractual terms.

This court then finds that as a result of the assignment by American Magnesium of all its assets to the joint venture, the debtor will have disposed of all right, title and interest in and to the magnesium property and will have no rights whatsoever to participate in the management or operation of such enterprise. Thus, the assignment obviously is covered in the original agreement between Ozark and American Magnesium referring to the event which would give rise to the right of termination by American Magnesium of Ozark's royalty payments and such termination should be allowed.

This court finds that the original rulings by the bankruptcy judge were correct and the cause is reversed and remanded so that those rulings might be enforced.