**In re Edward J. WALDRON and Elizabeth M. Waldron, his wife.**

**Bankruptcy No. 83–01175–BKC–JAG.**

United States Bankruptcy Court,
S.D. Florida.

Jan. 5, 1984.

634

Alan T. Dimond, Miami, Fla., for creditor.

Edward J. Waldron, pro se.

## PARTIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CHAPTER 13 PLAN AND SETTING FURTHER EVIDENTIARY HEARING ON AMOUNT OF DAMAGES AND CONFIRMATION OF CHAPTER 13 PLAN

JOSEPH A. GASSEN, Bankruptcy Judge.

This case raises the issues of whether an option contract to purchase land can be rejected under 11 U.S.C. § 365(a) where the debtor's sole purpose of filing a Chapter 13 petition is to reject the option agreement, and if so, what is the proper measure of damages to be awarded the creditor/optionee under the Chapter 13 plan. As a necessary component of the analysis, three corollary issues are resolved: (1) whether the option agreement is a valid and enforceable contract; (2) whether the option agreement is an executory contract subject to rejection under § 365; and (3) what is the appropriate standard to be applied in rejecting the option contract.

### FINDINGS OF FACT

On June 24, 1983, Debtors, Edward J. Waldron and Elizabeth M. Waldron, his wife, filed a joint voluntary petition under

Chapter 13 of the Bankruptcy Code. Debtors' Chapter 13 petition listed only one creditor, Shell Oil Company ("Shell"). It is this "debt" owed to Shell which gave rise to the present dispute.

The Debtors, Edward J. Waldron and Elizabeth M. Waldron, entered into an option agreement with Shell on January 15, 1964. Debtors granted Shell the option to purchase real property located at 2727 West Flagler Street, Miami, Dade County, Florida. The agreement provided further that Shell would have the right to exercise the option at any time after January 1, 1984. Debtors granted Shell this option as part of a transaction where Shell purchased an adjacent parcel of real estate from Mr. Waldron's father and an easement in front of the parcel subject to the option agreement. Additionally, the option agreement recited consideration of Ten Dollars ($10.00) received by Mr. Waldron. Mr. Waldron later stipulated that he actually received from Shell the Ten Dollar ($10.00) consideration. The option agreement, the easement granted to Shell and the warranty deed for the adjacent parcel were recorded simultaneously in the Official Records of Dade County, Florida.

Debtors' Chapter 13 plan provided for a one hundred percent (100%) payment to all unsecured creditors. The proposed payment was to be made in one lump sum, six (6) months after confirmation. As noted above, Debtors' only listed creditor was Shell.[1] In the plan, Debtors sought to reject the option agreement pursuant to 11 U.S.C. § 365. Debtors further sought to limit Shell's damages to a refund of the consideration recited in the option agreement, i.e., Ten Dollars ($10.00), relying on 11 U.S.C. § 365(j).

Shell was not represented at the meeting of creditors or at the confirmation hearing and did not file an objection to the confirmation or a proof of claim. It was, however, apparent to the Court that the notice of the creditors' meeting and confirmation hearing might not have reached the appropriate parties at Shell's offices. Moreover, it was clear that a great deal was at stake in Debtors' rejection of the option agreement. [Shell requested and was granted, in the Court's discretion, leave to file its objection to the proposed Chapter 13 plan].

*Can An Individual File A Petition Under Chapter 13 Containing A Rejection Of An Option Contract As An Executory Contract Where There Are No Debts And No Other Purpose In The Chapter 13 Plan?*

■ Shell has argued that the Debtors must not be allowed to invoke the jurisdiction of the Bankruptcy Court under Chapter 13 solely to reject the option contract. In support of its position, Shell noted that the threshold inquiry when examining a Chapter 13 plan prior to confirmation is good faith: "The Court shall confirm a plan if ... the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). Moreover, Shell argued that Debtors' use of Chapter 13 solely to avoid the option contract is an inappropriate and unjustified use of the bankruptcy process, quoting: "The bankruptcy laws are intended as a shield, not as a sword." *In re Penn Central Transportation Co.,* 458 F.Supp. 1346, 1356 (E.D.Pa. 1978).

In this instance, however, it is clear that Debtors could readily refile their bankruptcy petition under Chapter 11. Several courts that have examined the issue have concluded that it is not an abuse of the bankruptcy process to file a petition under Chapter 7 or 11 solely to reject an executory contract. *In re Bofill,* 25 B.R. 550 (Bkrtcy.S.D.N.Y.1982). In fact, in *In re Marina Enterprises, Inc.,* 14 B.R. 327 (Bkrtcy.S.D.Fla.1981), the creditor filed an objection that the debtor should not be "rewarded by permitting it to use the bankruptcy court for the primary purpose of cancelling the lease." 14 B.R. at 331. This

---

1. Although Debtors later filed an amended Chapter 13 petition to include two purported unsecured creditors, Debtors later stipulated that they did not and would not rely on the amended petition to support their position.

Court concluded that Congress has adopted the Bankruptcy Code to give the business debtor a second chance through the Chapter 11 process; this process includes the right to reject executory contracts.

Because it is apparent that Debtors could file a proceeding under Chapter 11 to achieve their purpose of rejecting the executory contract, it becomes academic that Debtors may reject the option contract as an executory agreement under 11 U.S.C. § 365.

Furthermore, Congress intended for the bankruptcy laws to be widely available; the bankruptcy laws were not designed to operate as a screen to determine a debtor's eligibility. The application of the bankruptcy laws should only provide meaningful relief to a good faith debtor who is or may soon be financially distressed. A good faith debtor who is not financially distressed, and for whom that condition is not imminent, should find himself in no better position having availed himself of the bankruptcy laws than if he had pursued alternative remedies in state court. In other words, the bankruptcy laws only operate to afford a fresh start to a needy debtor, not a windfall to a trouble-free debtor. While a good faith debtor may feel free to apply the bankruptcy laws to his particular situation, unless he is financially distressed, he will find that he has accomplished little, as the whole thrust of the bankruptcy laws are to provide relief from problems which a trouble-free debtor does not have. No provision in the Code will operate as a treasure trove for a trouble-free debtor. Accordingly, the Debtors are nevertheless not precluded from utilizing Chapter 13 solely to reject the option contract.

2. This Court finds that an executory contract is defined under federal, not state law. "Where possible, the Code should be given federal meaning. This permits uniformity in a national system; it promotes exegesis in line with bankruptcy policies." *In re Summit Land Co.,* 13 B.R. at 317. Countryman, whose views on this subject are embodied in the legislative history of § 365, *see* Countryman, *Executory Contracts*

### Is The Option Contract To Purchase Real Property Unenforceable Due To Insufficient Consideration?

■ Debtors asserted in the Chapter 13 plan that the "option is further rejected as not being supported by valuable consideration." Chapter 13 plan at 2. It is clear, however, that the contract is supported by valuable consideration. In *Benson v. Chalfonte,* 348 So.2d 557 (Fla. 4th DCA 1976), the court, examining an option contract, explained that the option "may be supported by any labor, detriment or inconvenience, *however small,* sustained by the plaintiff." *Id.* at 559 (emphasis in original). This position is followed by the courts and commentaries that have examined the issue. Professor Williston explained: "Even nominal consideration ... will be given that effect." Williston on Contracts § 61C (3d ed. 1957). The Restatement (Second) of Contracts § 87 provides that an offer is binding as an option contract if it "recites a purported consideration for the making of the offer." Thus, the option contract in the present case is a binding, enforceable agreement.

### Is An Option Contract An Executory Contract Which May Be Rejected Pursuant To 11 U.S.C. § 365 In A Chapter 13 Plan?

■ After reviewing the case law and legislative history on the subject, this Court concludes that an option contract to purchase real property is indeed an executory contract within the meaning of § 365 and therefore subject to rejection. *See In re Jackson Brewing Co.,* 567 F.2d 618 (5th Cir.1978); *Jenson v. Continental Financial Corp.,* 591 F.2d 477 (8th Cir.1979); *Allvend Industries v. Brauser,* 2 Bankr.Ct.Dec. 29 (S.D.N.Y.1975). *But see In re Continental Properties,* 15 B.R. 732 (Haw.1981).[2]

*in Bankruptcy,* 57 Minn.L.R. at 456 n. 71 and 466 n. 106, concurs that the characterization of the contract under state law should not control under bankruptcy law. Moreover, interpretation of an executory contract under state law serves purposes which are unrelated to the purposes served under § 365. Florida, for example, views option contracts as being non-executory in nature. *Baker v. Coleman,* 16 Fla.

■ While Congress specifically refrained from defining an executory contract for purposes of § 365, the legislative history suggests that a contract is executory where performance remains due, to some extent, by all contracting parties. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977), [1978] U.S.Code Cong. and Ad.News 5787, 6303; S.Rep. No. 95–989, 95th Cong., 2d Sess. 58 (1978), [1978] U.S.Code Cong. and Ad.News 5844; *see also* Countryman, *Executory Contract in Bankruptcy,* 57 Minn.L.R. 439, 460 (1973); *Ozark-Mahoning Co. v. American Magnesium Co.,* 488 F.2d 147, 152 (5th Cir.1974). If performance on one side of a contract is completed with performance yet remaining due on another side, the contract is not executory. *Id.*

■ It seems clear that in the instant case, performance continues to remain due on the part of the Debtors. The Debtors, in entering into the option agreement, had agreed to relinquish their right to revoke their offer to sell the property to Shell under the stated terms. The Debtors' forbearance of their right to revoke their offer will continue until the option lapses on December 31, 1994. This performance which remains due by the Debtors was the object bargained for by Shell, the optionee, in exchange for the valuable consideration, i.e., Ten Dollars ($10.00) paid to the Debtors.

On the side of Shell, the optionee, it is reasonable to presume that performance in accordance with the option agreement will in fact occur. It is uncontroverted that the fair market value of the property significantly exceeds the exercise price of the option. In fact, the intrinsic value of the option contract, the excess of the fair market value of the property over the option price, was significant enough to motivate the Debtors to attempt to ameliorate or avoid the remedies that would otherwise be available to Shell had the Debtors not filed a bankruptcy petition and breached the option contract. In addition, the value of the option contract to Shell was significant enough to motivate Shell to vigorously resist the Debtors' attempt to do so. Consequently, it is completely foreseeable that Shell, or their assignees, will exercise the option, as no reasonable and prudent person would abandon such a valuable asset. It follows, then, that in order for Shell or its assignees to exercise this option, it is obligated to tender its acceptance of the Debtors' irrevocable offer in accordance with the method and terms set forth in the option agreement. As it is presumed that exercise of the option will occur, the obligation to comply with the method and terms in order to effectuate the exercise is the performance that foreseeably remains due by Shell or its assignees. Once Shell or its assignees properly tender its acceptance of the Debtors' irrevocable offer, thereby exercising the option, the option contract will immediately transform into an executory contract for the sale of real property.

In addition, this Court bases its conclusion that the option contract is an executory contract within the meaning of § 365 on general policy considerations which underlie § 365. "[I]n the final analysis, executory contracts are measured not by a mutuality of commitments, but by the nature of the parties and the goals of reorganization. . . . Thus, it is the consequences of applying § 365 to a party, especially in terms of the benefit to the estate and the protection of the creditors, not the form of [the] contract . . . which controls." *In re Booth,* 19 B.R.

297, 34 So.2d 538 (1948). In *Baker,* the court stated:

> [a]n option [is] a continuing offer on the part of the optioner to sell and, if limited to a certain time, it is essential that it be accepted by the optionee within that time by compliance with its terms, and, if not accepted, within the time specified, the right to do so is lost. Such an option is accordingly an executed unilateral contract, and not an executory one.

*Id.* 34 So.2d at 539. The central issue that *Baker* was resolving in concluding that the option contract was not executory was whether the optionee exercised his option in the time and manner required by its terms. Clearly, the purposes served by the court in *Baker* in interpreting the executory nature of option contracts is wholly distinct and unrelated to the primary purposes served under § 365, which are to properly address continuing obligations by a debtor in a bankruptcy proceeding.

53 (Bkrtcy.1982). This Court finds the reasoning discussed in *Booth* highly persuasive:

> There are many examples of the use of "policy", rather than a rule like the Countryman test, in determining what is an "executory contract" within the scope of § 365 under the Code and § 70(b) under the Act.
>
> Although "the unexpired lease is the archetype of the rejectable contract," Silverstein, *"Rejection of Executory Contracts in Bankruptcy and Reorganization,"* 31 U.Chi.L.Rev. 467, 479 (1964), its treatment has varied depending upon the policies at stake. *In re Freeman,* 49 F.Supp. 163 (S.D.Ga.1943), permitted rejection of a lease, notwithstanding language in § 70(b) which forbade deprivation of a lessee's estate, because this result furthered rehabilitation under Chapter XII. Collier criticizes the decision because the court "overlooked the fact that the lessee had a vested estate that is distinct from the executory covenant in the lease. In a case concerning a lease of personal property, there is no 'estate' and the lessee's interest may be terminated by rejection of the lease. In the case of a lease of real property, the desire to effect a feasible plan of reorganization could not override the vested rights of lessees who were not mere creditors of the debtor." 2 Collier on Bankruptcy ¶ 365.09 at 365.45–365.46 (15th ed. 1980). Put more directly, "[i]n some situations ... it is socially desirable that the lessee have a high degree of assurance that his possession will not be interrupted by lessor bankruptcy. The lessee with a large investment in equipment, inventory and good will, for instance, has a legitimate claim to greater protection than the ordinary unsecured creditor." Silverstein, *supra* at 484. *See also* Creedon and Zinman, *"Landlord's Bankruptcy: Laissez Les Lesees,"* 26 Bus.Law. 1391, 1402 (1971).
>
> Under the Code and § 365, the exceptions virtually swallow the Countryman rule. Personal service contracts, whether or not performance is due on both sides, are non-assumable under § 365(c)(1).

This "carries out a policy, implemented judicially ... against the use of legal compulsion ... to force a non-debtor party either to accept the personal services of, or to perform personal services for, the debtor or the trustee succeeding him." *Report of the Commission on the Bankruptcy Laws of the United States,* *supra* Part II, at 158. *See also* Countryman, *"Executory Contracts in Bankruptcy: Part II,"* 58 Minn.L.Rev. 479, 482–484 (1974). Contracts for the extension of credit or other "financial accommodations," or to issue securities of the debtor, whether or not performance is due on both sides, are non-assumable under § 365(c)(2). Shopping center leases, § 365(b)(3), aircraft equipment and ocean vessels, 11 U.S.C. § 1110, and rolling stock, 11 U.S.C. § 1168, are given special dispensations.

> Under the Act and § 70(b), a security agreement, even though performance remained due on both sides, was not an executory contract. This "shielding" of secured creditors was "justified because unsecured creditors have notice of the lien through recordation or filing." Silverstein, *supra* at 478. Similarly, "[t]he bankrupt licensee of a patent, copyright or trademark usually has an executory duty to pay royalties and the licensor has an executory duty not to license other persons. Although one might suppose that a trustee in bankruptcy can reject such a contract, since it is executory on both sides, the American cases most nearly in point have implied that it is not rejectable," probably because of a "judicially created policy of protection and encouragement of creative genius." *Id.* at 480 and 482. Public utilities are another special case due to "countervailing public policy." *Id.* at 482. And so are collective bargaining compacts. *See, e.g.,* Hughes, *"'Wavering Between the Profit and the Loss': Operating a Business During Reorganization Under Chapter 11 of the New Bankruptcy Code,"* 54 Am.Bank.L.J. 45, 84–86 (1980); Levy and Blum, *"Limitations on Rejection of Union Contracts*

*Under the Bankruptcy Act,"* 83 Comm. L.J. 259 (1978); Note, *"The Bankruptcy Law's Effect on Collective Bargaining Agreements,"* 81 Colum.L.Rev. 391 (1981); Note, *"The Labor-Bankruptcy Conflict: Rejection of a Debtor's Collective Bargaining Agreement,"* 80 Mich.L. Rev. 134 (1981); Comment, *"Bankruptcy and the Rejection of Collective Bargaining Agreements,"* 51 Notre Dame L.Rev. 819 (1976); Comment, *"Collective Bargaining Agreements and Bankruptcy,"* 42 So.Cal.L.Rev. 477 (1969); *In re Unishops, Inc.,* 543 F.2d 1017 (2d Cir.1976); *Truck Drivers Local Union No. 807 v. Bohack Corp.,* 541 F.2d 312 (2d Cir.1976); *Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir.1975); *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.,* 519 F.2d 698 (2d Cir.1975); *Local Joint Executive Bd. v. Hotel Circle, Inc.,* 613 F.2d 210 (9th Cir.1980); *Matter of Alan Wood Steel Co.,* 449 F.Supp. 165 (D.Pa.1978); *In re Overseas Nat'l Airways, Inc.,* 238 F.Supp. 359 (E.D.N.Y.1965).

This approach may be criticized for being result oriented. Result-orientation, however, is endemic to the policymaking which has determined what is an executory contract and when it is rejectable within the scope of §§ 365 and 70(b). Indeed, the Countryman test, which is predicated on the policy of benefit to the estate, is result oriented. Some commentators and courts have frankly admitted as much. *See, e.g.,* Julis, *supra* at 246 and 249 ("the framework calls for the systematic identification of the consequences to the estate, the debtor, and to the nondebtor party to the contract in question, that arise from applying § 365 to the contract"); *In re Jolly,* 574 F.2d 349, 351 (6th Cir.1978) ("such definitions [as the Countryman test] are helpful, but do not resolve this problem. The key, it

seems, to deciphering the meaning of the executory contact rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act").

*Id.,* n. 6 at 57.

■ An interpretation of the option contract as an executory contract benefits the estate, since it allows for it to be dealt with in the bankruptcy proceeding and, as discussed *infra,* does not detract from the protection afforded to Shell, the creditor.[3]

■ In determining whether the Debtors may reject the executory contract, the proper test to be applied is the business judgment test. As the Court has previously stated: "[T]his Court is satisfied that the 'business judgment' test, rather than the 'burdensome' test, is to be applied." *In re Sombrero Reef Club, Inc.,* 18 B.R. 612, 617 (Bkrtcy.S.D.Fla.1982). *See also In re Minges,* 602 F.2d 38 (2d Cir.1979); *In re Farrar McWill, Inc.,* 26 B.R. 313 (Bkrtcy.W.D.Ky. 1982).

The reasoning utilized in *In re Minges,* 602 F.2d 38 (2d Cir.1979), is persuasive:

We believe that such a flexible test for determining when an executory contract may be rejected, however termed (and "business judgment" is as good a label as any), is most appropriate. For in bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor. A rigid test, permitting rejection only where the executory contract will cause a net loss to the debtor's estate if performed, might work a substantial injustice in cases where it can be shown

---

**3.** Shell did not argue, in the alternative, that the option contract satisfies the definition of a "claim" under Section 101(4). While this is not an issue put forth before this Court, a finding that the option contract is neither a claim nor an executory contract would cause the option

contract to survive this proceeding. This result would impede judicial economy, as this whole matter could subsequently evolve again at the time Shell or their assignees exercise their option contract.

that the non-debtor contracting party will reap substantial benefits under the contract, while the debtor's creditors are forced to make substantial compromises of their claims.

*Id.* at 43. It is clear that the "burdensome and onerous" test would provide too rigid a standard and would act as an obstacle, rather than as an aid, to maximum recovery for both debtor and creditor alike.

■ It is in this regard that reliance on *Jackson Brewing Co.,* 567 F.2d 618 (5th Cir.1978), may be misplaced. Although the court in *Jackson* ostensibly applied the "burdensome and onerous" test, the facts are unique and distinguishable from the present case. In *Jackson,* the debtor placed a mortgage on the subject property after the option to purchase the property was recorded. Consequently, an assumption of the option contract by the debtor would have defeated the mortgagee's security interest in the property, diminished practically the entire value of the estate and thwarted the debtor's attempt to reorganize. The court concluded: "A rejection of the onerous contract is manifestly for the benefit of the creditors, will enhance the possibility of reorganization, and even in the event of a liquidation, will permit an equitable distribution of the debtor's assets among its creditors." *Id.* at 624.. Unlike *Jackson,* in the present case there are no other competing creditors whose interest would be materially affected by an assumption of the option contract as Shell is the only listed creditor. However, like *Jackson,* a rejection of the option contract would not only serve the purposes of the Debtors, but would also be manifestly beneficial to their creditor, Shell, for two reasons. First, Shell's interest is fully protected by the proper award of damages, and second, the value of the Debtors' estate will be no less than the amount of Shell's claim. Accordingly, it is clear that the business judgment test is the appropriate test to be applied in the present case, since, as the court in *Jackson* sought to accomplish by utilizing the burdensome and onerous test, the interest of all parties will be more equitably served.

In addition, Shell's reliance on *Jackson Brewing Co.* is misplaced for another reason. *Jackson* was decided under the Act, whereas the present case is bound by the Code. Under the Code, Congress limited the court's jurisdiction to interfere with the exercise of the trustee's or debtor-in-possession's discretion to assume or reject executory contracts. "It may well be that under the policy of judicial independence mandated by the Code, and in light of the purpose and effect of § 365 as a whole, a trustee's or debtor-in-possession's decision to reject should usually be approved, and rejection denied only where the trustee's decision was clearly erroneous." *In re Sombrero Reef Club, Inc.,* 18 B.R. 612 at 617 (Bkrtcy.S.D. Fla.1982). *See also Summit Land Co. v. Allen,* 13 B.R. 310 (Bkrtcy.Utah 1981). In *Summit,* the court stated:

... Court approval under § 365(a), if required, except in extraordinary situations, should be granted as matter of course. To begin, this rule places responsibility for administering the estate with the trustee, not the court, and therefore furthers the policy of judicial independence considered vital by the authors of the Code. Second, this rule expedites the administration of estates, another goal of the Bankruptcy Reform Act. Third, the rule encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements.

*Id.* at 315. Moreover, the court in *Summit,* in addressing the issue of whether land sale contracts should be given special treatment under the Code and therefore should not be rejectable unless onerous and burdensome, noted the following:

Defendants ... rely upon two authorities, 3 Collier on Bankruptcy, ¶ 365.10 at 365–47 (15th ed. 1980), and *In re Jackson Brewing Co.,* 567 F.2d 618 (5th Cir.1978), to demonstrate that land sale contracts are rejectable only if "burdensome". Collier, read in context, is speaking of pre-Code law, where treatment of land sale contracts was unsettled and a vendee's status was ambiguous. This may have prompted special scrutiny whenever the trustee proposed to reject such bargains.

Pre-Code decisions, however, are not universal in support of this analysis. *See, e.g., In re New York Investors Mutual Group,* 143 F.Supp. 51, 56 (S.D.N.Y.1956). In any event, the problem has been resolved under the Code. Whether *Jackson* propounds a "burdensome" test is uncertain. The opinion is inexplicit on this point. Its facts could support a different view. It is cited by later cases in support of the business judgment rule. *See, e.g., In re Minges, supra* at 43. The *King* [*v. Baer,* 482 F.2d 552 (10th Cir.1973)] and *Workman* [*v. Harrison,* 282 F.2d 693 (10th Cir.1960)] cases, noted above, from the Tenth Circuit, also deal with real estate interests and they follow the business judgment rule. For these reasons, defendants' authorities are not persuasive.

*Id.,* n. 7 at 315.

In contrast to the Act where the courts were permitted to take a more active role in the assumption or rejection process, the courts are required to take only a passive role under the Code.

Accordingly, this Court may not overturn a decision by the Debtors to reject the executory option contact unless there is a showing that there has been an abuse of discretion or "where the [Debtors'] decision was clearly erroneous." *In re Sombrero Reef Club, Inc., supra* at 617. The utilization of the two-pronged test, the "onerous and burdensome" test, is too restrictive on the Debtors. A "business judgment" test, on the other hand, gives the Debtors the latitude in exercising their discretion which is more consistent with what Congress had intended under the Code.

### What Are The Proper Measures Of Damages?

Since the Court finds the rejection of the option contract proper, the Court will require a further hearing to determine damages that the Debtors must pay Shell under the Chapter 13 plan:

[T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease ... if such contract or lease has not been assumed under this section or under a plan confirmed under Chapter 9, 11, or 13 of this title ....

11 U.S.C. § 365(g)(1). 11 U.S.C. § 502(g) states that "[a] claim arising from a rejection, under § 365 of this title or under a plan under Chapter ... 13 of this title, of an executory contact ... of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this action ... the same as if such claim had arisen before the date of the filing of the petition." Thus, the rejected contract is considered to have been breached immediately before the date of filing the petition.

■ The Debtors have erroneously asserted that 11 U.S.C. § 365(j) operates as a limitation on the amount of damages allowed in connection with the rejection of an executory contact for the sale of real property. Section 365(j) states that "... a party whose executory contact to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of the purchase price as such party has paid."

■ This provision in no way limits the amount of damages awarded to Shell for two reasons. First, § 365(j) is inapplicable, since a sale of the real property has not yet taken place. A contract for the sale of real property will occur only at the moment that Shell or their assignees exercise their option to purchase the subject property. Second, § 365(j) was intended only to create a lien on real property in favor of a non-possessory purchaser to secure the amount of the purchase price paid. *Desmond & Snelling Electrical Contractors v. 18th Avenue Development Corp.,* 1 C.B.C. 698 (B.Ct.S.D.Fla.1979). Accordingly, even if this option contact were to be viewed as an executory contact for the sale of real property within the meaning of § 365(j), Shell would not be entitled to a lien on the property, since no amount of the $40,000 purchase price has been paid. If Congress intended to limit the amount of a claim for breach on an executory contact for the sale

of real property, its intent would have been expressed under § 502(b) which deals specifically with claim limitations. (See, for example, § 502(b)(7) which limits the amount of a claim by a lessor for damages resulting from the rejection of a lease of real property, and § 502(b)(8) which limits the amount of a claim for damages resulting from the rejection of an employment contract). Therefore, the amount of Shell's claim for damages resulting from the rejection of the option contact will be determined in accordance with Florida law.

■■■ Under Florida law, damages for breach of contract must place the non-breaching party in the same financial position as he would have occupied had the contract been performed. *Ashland Oil, Inc. v. Pickard,* 269 So.2d 714 (Fla. 3d DCA 1972). Thus, Shell is entitled to the "benefit of the bargain;" that is, the difference between the estimated market value of the property at the time the option becomes exercisable on January 1, 1984, less the option agreement price, plus an additional speculative premium, if any, reflecting anticipated appreciation of the value of the property at the time the option will lapse on December 31, 1994, as well as any additional loss suffered by Shell as the natural and proximate result of the breach. *See* 33 Fla.Jur., *Vendor & Purchaser,* § 173; *Muroff v. Dill,* 386 So.2d 1281 (Fla. 4th DCA 1980).[4]

■■■ Debtors have argued erroneously that the damages in the present case should be limited to the Ten Dollars ($10.00) recited consideration in the option contract. Debtors rely primarily on those cases that follow the "English" rule dating from *Flureau v. Thornhill,* 2 W.Bl. 1078, 96 Eng.Rep. 635 (1776). *Flureau* limits the purchaser, in an action for breach of contract to convey title to real estate, to the purchase money paid by the purchaser, together with interest and reimbursement of expenses, except where the vendor has acted in "bad faith." *See, e.g., Liberis v. Cameris,* 107 Fla. 352, 146 So. 220 (1933); *Key v. Alexander,* 91 Fla. 975, 108 So. 883 (1926). This, in fact, is the amount recoverable for rescission of the contract. Rescission and restitution would only be permitted where the vendor acted in good faith and his ability to complete the transaction was thwarted by reasons beyond his control. An example of the good faith requirement entitling relief to a vendor from what would otherwise be "benefit of the bargain" damages to restitution damages would be the vendor's inability to deliver marketable title. *Horton v. O'Rourke,* 321 So.2d 612. Clearly, the rule of *Flureau* is inapplicable in this case, as "good faith" conduct by the vendor does not encompass the Debtors' refusal to perform, in invoking Chapter 13, due to their desire to be released from what had turned out to be, in hindsight, a bad business deal. Thus, Shell is entitled to full compensation for its loss, i.e., compensatory, consequential and incidental damages.

The hearing to determine Shell's damages to be paid under the Debtors' Chapter 13 plan and confirmation hearing is set on Tuesday, February 14, 1984 at 1:30 P.M. in Courtroom 1410, Federal Building, 51 S.W. First Avenue, Miami, Florida.

---

4. The Code does not permit specific performance as a remedy resulting from the rejection of an executory contract under § 365. While this remedy may have otherwise been available to Shell had the Debtors simply breached the option contact and chosen to litigate this matter in state court, Shell, in the present case, argued that if this Court finds the contract rejectable under § 365, compensatory damages under "benefit of the bargain" test would provide the proper relief. Therefore, this Court need not consider the issue of whether Shell would be entitled to avail itself of a more liberal measure of damages to reflect a unique and peculiar use of the subject matter.